Judgment affirmed in part<br>and reversed in part.

PIETRYKOWSKI, P.J., and SKOW, J., concur.

---

**MASTELLONE et al., Appellants/Cross–Appellees,**

**v.**

**LIGHTNING ROD MUTUAL INSURANCE COMPANY, Appellee/Cross–Appellant.**

[Cite as *Mastellone v. Lightning Rod Mut. Ins. Co.*, 175 Ohio App.3d 23, 2008-Ohio-311.]

Court of Appeals of Ohio,
Eighth District, Cuyahoga County.

No. 88783.

Decided Jan. 31, 2008.

24

McMahon DeGulis, L.L.P., Gregory J. DeGulis, and Meagan L. Moore; and Dan Morell & Associates Co., L.P.A., Dan A. Morell Jr., and Jason M. Panek, for appellants/cross-appellees.

Weston Hurd, L.L.P., Shawn W. Maestle, Ronald A. Rispo, and Jeffrey R. Lang; and Baker & Hostetler, L.L.P., and David R. Jarrett, for appellee/cross-appellant.

MELODY J. STEWART, Judge.

{¶ 1} Plaintiffs-appellants/cross-appellees, Gerald and Dawn Mastellone, appeal from a split jury verdict on their complaint against defendant-appellee/cross-appellant Lightning Rod Mutual Insurance Company that alleged that Lightning Rod had breached a homeowner insurance policy and acted in bad faith by refusing to provide coverage for mold found on the exterior and interior of their house and for water damage to their basement. Although they prevailed on the claim relating to coverage for exterior mold, the Mastellones argue that the court erred by (1) bifurcating the bad-faith claim, (2) directing a verdict on the issue of interior loss, (3) denying prejudgment interest, and (4) granting summary judg-

ment on the bad-faith claim.[1] Lightning Rod cross-appeals, arguing that the court erred by denying its motions for a directed verdict and judgment notwithstanding the verdict on exterior damages. We conclude that the court did not abuse its discretion by bifurcating the bad-faith claim, nor did it err by directing a verdict on the issues of water damage to the basement and interior mold. We do conclude, however, that the court erred by refusing to direct a verdict in Lightning Rod's favor on the claim for exterior mold. We therefore reverse the jury's verdict and vacate the award of damages.

I

{¶ 2} The Mastellones began construction of the house in question in 1988. Their "dream house" featured a vaulted ceiling and numerous skylights. Describing the house as "chalet-style," the Mastellones chose to clad the exterior with rough-sawn cedar siding that they sealed with a semi-transparent stain containing a mildewcide.

{¶ 3} Problems with the house arose almost immediately. The Mastellones had the roof replaced in 1992 because some of the wood shake shingles had discolored. The new roof then experienced water leaks. In 1995, high winds tore off shingles near the chimney, causing water to leak inside near the fireplace. In October 2001, another wind storm blew several shingles off the roof. And in April 2002, high winds sent water into the solarium and another room that had a glass wall and ceiling. A roofing company blamed the water intrusion on skylights; the window company that installed the skylights blamed the water intrusion on a leaking roof.

{¶ 4} Gerald testified that in August 2002, he first noticed "black stuff" on the side of the house. An insurance agent by trade, Gerald had attended a seminar at which agents were told that insurance companies would be tightening exclusions relating to mold in homeowners' policies. Shortly after attending this seminar, he filed his notice of loss relating to mold.

{¶ 5} Lightning Rod sent a reservation-of-rights letter the same day it received the Mastellones' notice of loss and hired a company to investigate the mold claim. That company, Auburn Environmental, confirmed the presence of mold on both interior and exterior surfaces of the house. Exterior mold growth had formed on the cedar siding because the rough-hewn nature of the wood allowed dust and organic particles to accumulate in small crevices within the wood. Ordinarily, these organic particles were harmless on wood that had been properly ventilated or exposed to sunlight. However, when these particles were subjected to certain

---

1. The Mastellones make no argument relating to the issue of water in the basement and thus waive it on appeal.

heat and humidity levels, they would grow into mold. The exterior mold took the form of dark staining and appeared to have formed most significantly in soffits that were neither well-ventilated nor exposed to sunlight.

{¶ 6} Although Auburn Environmental concluded that mold levels were not at dangerous levels, the Mastellones chose to vacate the house, citing health concerns for one of their children. The Mastellones engaged the services of an environmental consultant to examine the mold, but that expert likewise concluded that the mold present both inside and outside the house was not at dangerous levels. The expert found numerous design defects with the house that impeded the ventilation of air; for example, he noted that a bathroom exhaust fan vented air into an eave space. The Mastellones did not ask this expert to prepare a report.

{¶ 7} The Mastellones then retained the services of a forensic architect who examined the ventilation system and determined that it was performing "reasonably." He concluded that interior and exterior mold staining were unrelated. He did not offer any opinion as to the source of the mold or its effect on humans.

{¶ 8} Lightning Rod eventually denied coverage, concluding that mold found in the house had developed as a result of design defects in construction that were excluded from coverage under the homeowners' policy. It concluded that the house had not been properly ventilated and that warm, moist air was trapped in soffits that had been covered by eaves. Lightning Rod did concede that the Mastellones might have a claim under the policy for water leakage in one of the bedrooms and the children's bathroom, but determined that a claim for loss for that damage had not been timely filed.

{¶ 9} The Mastellones then brought this action, asserting causes of action sounding in breach of contract and bad faith. The court bifurcated the bad-faith claims and submitted the contract claims to a jury. At the close of the Mastellones' case, the court directed a verdict in Lightning Rod's favor on claims relating to water in the basement. At the close of all the evidence, the court directed a verdict in Lightning Rod's favor on the claims for interior damage to the house. The jury then awarded the Mastellones damages for the exterior loss and certain living expenses. In posttrial proceedings, the court denied the Mastellones' motion for prejudgment interest, denied Lightning Rod's motion for judgment notwithstanding the verdict on the issue of exterior loss, and granted Lightning Rod's motion for summary judgment on the bad-faith claim.

## II

{¶ 10} The first assignment of error complains that the court erred by bifurcating the bad-faith claim from the contract claims. The Mastellones argue

that the court erroneously cited R.C. 2315.21(B) because that section had been adopted after they filed their claims in this case and, in any event, only permits bifurcation of punitive damages from tort actions—not contract actions.

## A

{¶ 11} Lightning Rod filed two motions to bifurcate the bad-faith claim. In its first motion, it requested bifurcation under Civ.R. 42(B), which permits the court to order a separate trial of any claim "in furtherance of convenience or to avoid prejudice." Lightning Rod argued that discovery related to the bad-faith claim included privileged attorney-client materials and that production of those materials would prejudice the coverage issue. The court denied the motion.

{¶ 12} Lightning Rod's second motion to bifurcate the bad-faith claim cited R.C. 2315.21(B)(1) for the proposition that recent amendments to that statute required bifurcation of claims for compensatory damages from punitive-damages claims. The court granted the motion without opinion.

## B

{¶ 13} R.C. 2315.21(B)(1) states:

{¶ 14} "In a tort action that is tried to a jury and in which a plaintiff makes a claim for compensatory damages and a claim for punitive or exemplary damages, upon the motion of any party, the trial of the tort action shall be bifurcated as follows:

{¶ 15} "(a) The initial stage of the trial shall relate only to the presentation of evidence, and a determination by the jury, with respect to whether the plaintiff is entitled to recover compensatory damages for the injury or loss to person or property from the defendant. During this stage, no party to the tort action shall present, and the court shall not permit a party to present, evidence that relates solely to the issue of whether the plaintiff is entitled to recover punitive or exemplary damages for the injury or loss to person or property from the defendant.

{¶ 16} "(b) If the jury determines in the initial stage of the trial that the plaintiff is entitled to recover compensatory damages for the injury or loss to person or property from the defendant, evidence may be presented in the second stage of the trial, and a determination by that jury shall be made, with respect to whether the plaintiff additionally is entitled to recover punitive or exemplary damages for the injury or loss to person or property from the defendant."

C

{¶ 17} The Mastellones filed the complaint on April 1, 2004. The amendments to R.C. 2315.21 became effective April 7, 2005, so they argue that the court erred by retroactively applying the statute to their complaint absent legislative authorization to do so.

{¶ 18} In *State v. Consilio*, 114 Ohio St.3d 295, 2007-Ohio-4163, 871 N.E.2d 1167, ¶ 9–10, the Supreme Court recently set forth the analysis to be applied when determining whether laws should be given retroactive application:

{¶ 19} "It is well-settled law that statutes are presumed to apply prospectively unless expressly declared to be retroactive. R.C. 1.48; *Van Fossen v. Babcock & Wilcox Co.* (1988), 36 Ohio St.3d 100, 105, 522 N.E.2d 489. It is also settled that the General Assembly does not possess an absolute right to adopt retroactive statutes. Section 28, Article II of the Ohio Constitution prohibits the retroactive impairment of vested substantive rights. See *State v. LaSalle*, 96 Ohio St.3d 178, 2002-Ohio-4009, 772 N.E.2d 1172, ¶ 13. However, the General Assembly may make retroactive any legislation that is merely remedial in nature. See *State ex rel. Slaughter v. Indus. Comm.* (1937), 132 Ohio St. 537, 542, 8 O.O. 531, 9 N.E.2d 505.

{¶ 20} "As noted in *Van Fossen* and *LaSalle*, we have distilled these principles into a two-part test for evaluating whether statutes may be applied retroactively. First, the reviewing court must determine as a threshold matter whether the statute is expressly made retroactive. *LaSalle*, 96 Ohio St.3d at 181, 772 N.E.2d 1172, citing *Van Fossen*, 36 Ohio St.3d 100, 522 N.E.2d 489, at paragraphs one and two of the syllabus. The General Assembly's failure to clearly enunciate retroactivity ends the analysis, and the relevant statute may be applied only prospectively. Id. If a statute is clearly retroactive, though, the reviewing court must then determine whether it is substantive or remedial in nature. *LaSalle* at 181, 772 N.E.2d 1172."

 {¶ 21} R.C. 2315.21(B) contains no express statement about being retroactive.[2] The statute does not "clearly enunciate retroactivity;" hence, our analysis comes to an end. R.C. 2315.21(B) may be applied only prospectively, so the court erred by granting the motion to bifurcate the bad-faith claim under that statute.

{¶ 22} Lightning Rod does not dispute that the General Assembly gave no indication of retroactivity to R.C. 2315.21(B), but argues that the court's decision

---

2. S.B. 80 contains limited retroactive provisions that involve asbestos claims and a ten-year statute of repose on product-liability and construction claims, with some exceptions. See R.C. 2125.02(D)(2)(a), 2305.10(C), and 2305.131.

to bifurcate would nonetheless have been correct under Civ.R. 42(B). That rule states:

{¶ 23} "The court, after a hearing, in furtherance of convenience or to avoid prejudice, or when separate trials will be conducive to expedition and economy, may order a separate trial of any claim, cross-claim, counterclaim, or third-party claim, or of any separate issue or of any number of claims, cross-claims, counterclaims, or third-party claims, or issues, always preserving inviolate the right to trial by jury."

{¶ 24} Lightning Rod first asked for bifurcation of the bad-faith claim pursuant to Civ.R. 42(B), arguing that it would be prejudiced if it were required to divulge in discovery attorney-client communications that were privileged.

{¶ 25} When Lightning Rod renewed its motion to bifurcate the bad-faith claim, it based the motion solely on R.C. 2315.21(B). The court granted the motion, stating that "Defendant Lightning Rod Mutual Insurance Company's second motion to bifurcate pursuant to O.R.C. 2315.21(B)(1)(a) and (b) as amended April 6, 2005 (filed 04/15/2005) is granted." Neither the court nor Lightning Rod made mention of Civ.R. 42(B).

■■ {¶ 26} A court's decision to grant or deny bifurcation of trial issues on Civ.R. 42(B) is reviewed for an abuse of discretion. *Garg v. State Auto. Mut. Ins. Co.*, 155 Ohio App.3d 258, 2003-Ohio-5960, 800 N.E.2d 757, at ¶ 28. The record unquestionably shows that the court exercised its discretion to deny the initial motion to bifurcate under Civ.R. 42(B), and instead granted the second motion under an erroneous application of R.C. 2315.21(B). Lightning Rod's argument urges us to find that the court's decision to bifurcate was correct under Civ.R. 42(B), even though the court expressly rejected Civ.R. 42(B) as a basis for bifurcation. Given the discretionary nature of a Civ.R. 42(B) bifurcation, we cannot hold that the court would have been correct in bifurcating under the rule when it so clearly stated its intentions otherwise.[3] We conclude that the court erred by applying R.C. 2315.21(B) as a basis for bifurcation.

## D

{¶ 27} Having found that the court erred by bifurcating the bad-faith claim from the contract claims, we next consider whether the error was prejudicial. Civ.R. 61 states:

---

**3.** Our conclusion should not be interpreted in any respect as either approving or disapproving the court's decision to deny the first motion to bifurcate. That issue is not before us on appeal, so we express no opinion on it.

{¶ 28} "No error in either the admission or the exclusion of evidence and no error or defect in any ruling or order or in anything done or omitted by the court or by any of the parties is ground for granting a new trial or for setting aside a verdict or for vacating, modifying or otherwise disturbing a judgment or order, unless refusal to take such action appears to the court inconsistent with substantial justice. The court at every stage of the proceeding must disregard any error or defect in the proceeding which does not affect the substantial rights of the parties."

{¶ 29} "Generally, in order to find that substantial justice has been done to an appellant so as to prevent reversal of a judgment for errors occurring at the trial, the reviewing court must not only weigh the prejudicial effect of those errors but also determine that, if those errors had not occurred, the jury or other trier of the facts would probably have made the same decision." *Hallworth v. Republic Steel Corp.* (1950), 153 Ohio St. 349, 41 O.O. 341, 91 N.E.2d 690, paragraph three of the syllabus.

{¶ 30} As part of a harmless-error analysis, we must address the impact, if any, of the court's posttrial summary judgment in Lightning Rod's favor on the bad-faith claim.[4] It could be argued that if properly granted, summary judgment on the bad-faith claim would render harmless any error relating to bifurcation. Summary judgment is granted when there are no issues of material fact to be tried and judgment should issue as a matter of law. See Civ.R. 56(C). If the court properly granted summary judgment on the bad-faith claim, bifurcation might have been nonprejudicial because the bad-faith claim should not, in any event, have been presented to the jury.[5]

---

4. As will be addressed in more detail later, a claim of "bad faith" in failing to process an insurance claim arises when there is no reasonable justification for an insurer's refusal to pay a claim. See *Zoppo v. Homestead Ins. Co.* (1994), 71 Ohio St.3d 552, 554–555, 644 N.E.2d 397. Lightning Rod based its bad-faith-claim motion for summary judgment on the defense verdicts on two of three counts in the complaint. It argued that these verdicts in its favor confirmed that it had reasonable justification for denying the claims. As for the remaining claim that resulted in a verdict for the Mastellones, Lightning Rod insisted that the mold exclusion contained in the policy had been clear and unambiguous and that the court erred as a matter of law by refusing to grant it judgment on the claim for exterior damage to the house.

5. We reject the argument made in the Mastellones' fourth assignment of error that the judge who presided over the trial had no authority to render a posttrial summary judgment because it exceeded the scope of the judge's assignment. The trial judge received the case by assignment because of the heavy trial schedule of the original assigned judge. See Sup.R. 17(A). While we express no opinion on whether a judge to whom a case has been transferred for trial has the authority to consider posttrial motions for summary judgment, the Mastellones did not object to the trial judge's handling of posttrial matters and, in fact, included the judge's name on the caption of their brief in opposition to Lightning Rod's motion for summary judgment on the bad-faith claim. They therefore waived the right to challenge the trial judge's authority. See *In re J.J.*, 111 Ohio St.3d 205, 2006-Ohio-5484, 855 N.E.2d 851.

{¶ 31} We acknowledge the efficacy of this argument, yet circumstances present in this case show that summary judgment on the bad-faith claim must be viewed in context of the entire record. The Mastellones initially objected to bifurcation by arguing that it would potentially deprive them of relevant discovery on their claims under the policy. They argued that bifurcation would be premature because no documents had been produced at that point. However, it appears that the Mastellones had ample opportunity to conduct discovery on the bad-faith claim given the court's rejection as "meritless" the Mastellones' argument that summary judgment should not issue under Civ.R. 56(F).[6]

{¶ 32} In its opinion granting summary judgment, the court noted that after it had denied Lightning Rod's first motion to bifurcate, discovery on the bad-faith claim had commenced. The court had ordered that "all claims file materials created prior to the decision to deny the claim are discoverable by the plaintiffs. All claims file materials created after the denial of coverage are protected from discovery by the plaintiffs." The Mastellones thereafter took depositions from two Lightning Rod representatives.

{¶ 33} Given the Mastellones' pretrial access to the claims file, we cannot say that the court abused its discretion by denying a continuance and ruling that they had a sufficient opportunity to conduct discovery on the issue of bad faith. This access to the claims file necessarily compels the conclusion that the court's bifurcation of trial resulted in no prejudice to the Mastellones. The Mastellones had ample opportunity to conduct discovery on the issue of bad faith as alleged in the complaint, and they made no showing that any relevant discovery would have been produced if the claims were not bifurcated. At the very least, any materials contained in Lightning Rod's claims file that had been generated after the declination of coverage would be irrelevant to the issue of bad faith in denying coverage. In summary, additional discovery would not have yielded any otherwise admissible evidence on the bad-faith claim apart from that which existed when Lightning Rod made its claims file available to the Mastellones. We therefore conclude that the court's erroneous decision to bifurcate trial did not cause a substantial injustice that requires a new trial.

E

{¶ 34} The Mastellones next argue that the court erred by granting summary judgment on the bad-faith claim because there were genuine issues of material

---

6. Civ.R. 56(F) states: "Should it appear from the affidavits of a party opposing the motion for summary judgment that the party cannot for sufficient reasons stated present by affidavit facts essential to justify the party's opposition, the court may refuse the application for judgment or may order a continuance to permit affidavits to be obtained or discovery to be had or may make such other order as is just."

fact relating to Lightning Rod's issuance of a reservation of rights letter [7] the same day the Mastellones made their claim.

{¶ 35} Summary judgment shall issue when, construing the evidence most strongly in favor of the nonmoving party, there is no genuine issue of material fact and reasonable minds could come to but one conclusion and that conclusion is adverse to the party against whom the motion for summary judgment is made. See Civ.R. 56(C).

{¶ 36} As previously noted, "[a]n insurer fails to exercise good faith in the processing of a claim of its insured where its refusal to pay the claim is not predicated upon circumstances that furnish reasonable justification therefor." *Zoppo*, 71 Ohio St.3d 552, paragraph one of the syllabus. This is a lesser standard than the former standard of "actual intent." *Wagner v. Midwestern Idemn. Co.* (1998), 83 Ohio St.3d 287, 290, 699 N.E.2d 507. A lack of reasonable justification exists when the denial of coverage is made in an arbitrary or capricious manner. *Hart v. Republic Mut. Ins. Co.* (1949), 152 Ohio St. 185, 87 N.E.2d 347.

{¶ 37} We view the evidence in a light most favorable to the Mastellones and give the disputed facts an interpretation most favorable to them. Those facts show that the Mastellones gave written notice of a claim under their homeowners' policy on September 19, 2002. By letter written that same day, Lightning Rod reserved its rights under the policy.

{¶ 38} The court held that Lightning Rod had a reasonable basis for denying coverage because the policy excluded coverage for mold. The court also held that Lightning Rod had "reasonable justification to deny the claim because it relied on Ohio case law which has found the mold exclusion to be a valid policy term." The court cited *Polk v. Landings of Walden Condo. Assn.*, Portage App. No. 2004–P–0075, 2005-Ohio-4042, 2005 WL 1862126, for the proposition that a policy exclusion relating to mold excluded loss caused by mold. Id. at ¶ 74. It therefore found that Lightning Rod's declination of coverage had not been made in bad faith.

{¶ 39} The Mastellones argue that *Polk* had been released in 2004, after Lightning Rod's 2002 declination of coverage, so the court erred by relying on that case to support Lightning Rod's refusal to provide coverage. Although the Mastellones are correct in noting that *Polk* had been released after Lightning

---

7. A reservation-of-rights letter from an insurer is a notice that even though the company is proceeding to handle the claim, certain losses might not be covered by the terms of the policy. By such a letter, the company preserves or "reserves" its right to deny coverage at a later date based on the terms of the policy. See, generally, *Motorists Mut. Ins. Co. v. Trainor* (1973), 33 Ohio St.2d 41, 62 O.O.2d 402, 294 N.E.2d 874.

Rod declined coverage, that fact is of no consequence. *Polk* provides justification for the declination of coverage. Likewise, Lightning Rod's prompt reservation of its rights is no indication that it did not handle the claim in good faith. By definition, a reservation of rights means that the insurer does not believe that coverage is available under the policy, but that it is proceeding to defend a claim in order to control the defense. The Mastellones' argument appears to suggest that if Lightning Rod had not acted so quickly in reserving its rights, it might have paid off the policy before any coverage questions arose. That argument is demonstrably without merit.

{¶ 40} Finally, the Mastellones argue that Lightning Rod took too long to make a coverage decision, relied on an "erroneous expert report," and then spent two years investigating the claim. As will be addressed in much greater detail below, there were conflicting opinions on both the nature of the mold and mildew and its cause. Lightning Rod secured an expert opinion showing that mold had occurred as a result of design defects in the house relating to ventilation of enclosed spaces. Another expert concluded that mold had grown because of improper maintenance of the cedar siding. In its letter declining coverage, Lightning Rod cited these experts and noted that the Mastellones had not, as of that date, forwarded a copy of any report from an expert of their own choosing. Although Lightning Rod's expert opinions could have been assailed, they were not. So when Lightning Rod declined coverage, it had no countervailing opinion to that of its experts. The expert reports, read in conjunction with policy provisions that excluded direct physical loss for mold, gave Lightning Rod reasonable justification for reserving its rights under the policy and engaging in a thorough investigation of the claim. The court did not err by granting summary judgment on the bad-faith claim.

### III

{¶ 41} The second assignment of error complains that the court erred by directing a verdict on the Mastellones' claim for interior loss to the house occasioned by mold around a skylight. They argue that the court erroneously concluded that the insurance policy predicate of "physical loss" required mold levels within the house to rise to dangerous levels. They also maintain that the court erred by concluding that claims for interior mold had not been brought within the one-year limitation period of the policy.

### A

### 1

{¶ 42} Civ.R. 50(A)(4) permits the court to direct a verdict when after construing the evidence most strongly in favor of the party against whom the

motion is directed, it finds that upon any determinative issue, reasonable minds could come to but one conclusion upon the evidence submitted and that conclusion is adverse to such party.

{¶ 43} "When a motion for a directed verdict is entered, what is being tested is a question of law; that is, the legal sufficiency of the evidence to take the case to the jury. This does not involve weighing the evidence or trying the credibility of witnesses; it is in the nature of a demurrer to the evidence and assumes the truth of the evidence supporting the facts essential to the claim of the party against whom the motion is directed, and gives to that party the benefit of all reasonable inferences from that evidence." *Ruta v. Breckenridge–Remy Co.* (1982), 69 Ohio St.2d 66, 68, 23 O.O.3d 115, 430 N.E.2d 935; see also *Strother v. Hutchinson* (1981), 67 Ohio St.2d 282, 284–285, 21 O.O.3d 177, 423 N.E.2d 467.

{¶ 44} The party who opposes a motion for a directed verdict must present evidence on one or more of the essential elements of a claim in order to defeat the motion. *Hargrove v. Tanner* (1990), 66 Ohio App.3d 693, 695, 586 N.E.2d 141. Under the "reasonable minds" portion of Civ.R. 50(A)(4), the court is required to consider only whether there exists any evidence of probative value in support of the elements of the nonmoving party's claim. See *Coleman v. Excello–Textron Corp.* (1989), 60 Ohio App.3d 32, 40, 572 N.E.2d 856; *Ruta,* 69 Ohio St.2d at 69, 23 O.O.3d 115, 430 N.E.2d 935. Where "there is substantial competent evidence [favoring the nonmoving party so that] reasonable minds might reach different conclusions," the court should not direct a verdict. *Ramage v. Cent. Ohio Emergency Serv. Inc.* (1992), 64 Ohio St.3d 97, 109, 592 N.E.2d 828.

{¶ 45} In *Sarmiento v. Grange Mut. Cas. Co.,* 106 Ohio St.3d 403, 2005-Ohio-5410, 835 N.E.2d 692, ¶ 11, the Supreme Court stated:

{¶ 46} "In Ohio, the statutory limitation period for a written contract is 15 years. R.C. 2305.06. However, the parties to a contract may validly limit the time for bringing an action on a contract to a period that is shorter than the general statute of limitations for a written contract, as long as the shorter period is a reasonable one. *Miller v. Progressive,* 69 Ohio St.3d 619, 624, 635 N.E.2d 317; *Colvin v. Globe Am. Cas. Co.* (1982), 69 Ohio St.2d 293, 295, 23 O.O.3d 281, 432 N.E.2d 167, overruled on other grounds by *Miller v. Progressive.* A contract provision that reduces the time provided in the statute of limitations must be in words that are clear and unambiguous to the policyholder. Id. at 296, 23 O.O.3d 281, 432 N.E.2d 167."

{¶ 47} The Lightning Rod policy contained a clause limiting a claimant's time within which to file an action to one year. Section 8 of the policy on page 14 of 23 states, "No action can be brought unless the policy provisions have been

complied with and the action is started within one year after the date of the loss." A one-year limitation-of-action clause in an insurance policy is considered reasonable. See *Broadview S. & L. Co. v. Buckeye Union Ins. Co.* (1982), 70 Ohio St.2d 47, 24 O.O.3d 109, 434 N.E.2d 1092; *Rak v. Safeco Ins. Co. of Am.,* Cuyahoga App. No. 84318, 2004-Ohio-6284, 2004 WL 2676740, at ¶ 22.

B

{¶ 48} When directing a verdict on the claim for interior loss, the court noted that evidence showed that the Mastellones had been aware of water intrusion into the house as early as 1991. At that time, they brought a legal action against the contractor who built the house, claiming that faulty construction had caused interior water damage to the house. Trial testimony also showed that apart from the 1991 legal action, the Mastellones testified that they had to make repairs to the skylight in October 2001 because of water leakage.

{¶ 49} The term "date of loss" is not defined in the contract. When terms are undefined, we generally give them their plain and ordinary meaning. *Nationwide Mut. Fire Ins. Co. v. Guman Bros. Farm* (1995), 73 Ohio St.3d 107, 108, 652 N.E.2d 684. When used in an insurance policy, the word "loss" is given its ordinary meaning of "injury; forfeiture; deprivation; damage; deficiency." *Polk v. Landings of Walden Condo. Assn.* at ¶ 79, quoting Gilbert's Law Dictionary (1994) 156.

{¶ 50} The uncontradicted evidence showed that the Mastellones knew they had interior water coming through the skylight in October 2001. A defense exhibit dated October 19, 2001, showed a roofing company work order that stated that four skylights had been caulked and that cap flashing had been installed "on leaking skylight." A December 21, 2001 work order from a window company stated "inspect six skylights for water infiltration. H/O states this has been an ongoing problem and we have been out to inspect several times."

{¶ 51} The court did not err by directing a verdict on the Mastellones' failure to file their suit within one year as required by the policy. The Mastellones filed their notice of property loss on September 19, 2002; and filed their complaint on April 1, 2004. The notice described the loss as "Mr. Mastellone has noticed mold surrounding a window. Please contact him directly as to when he noticed this mold in his home."

{¶ 52} No reasonable trier of fact could have found that the Mastellones were unaware of an alleged loss because of water leakage as of October 2001, and certainly no later than November 2001 when a work order described leaking skylights as an "ongoing problem." The policy required them to file their claims no later than November 2002. Despite having knowledge of the leaking skylights

no later than November 2001, the Mastellones did not file their complaint until April 1, 2004. This was well beyond the one-year limitation period.

{¶ 53} We also reject the Mastellones' claim that they filed their claim within the limitation period because Lightning Rod voluntarily granted several extensions of the limitation period. Lightning Rod granted extensions of the limitation period for bringing suit on claims for exterior loss, but specifically denied an extension for claims involving interior loss.

{¶ 54} In a letter dated August 25, 2003, the Mastellones noted that the date of loss had been identified as September 2002, and asked for an extension of the one-year period in which to bring suit. On August 27, 2003, Lightning Rod responded to the Mastellones' request by "agree[ing] that the time passing from this date forward will not count toward the one year period within which to file suit, we are not in agreement that the correct date of loss is September 19, 2002, and we do not agree that suit can still be commenced on all of the claims as presented." Lightning Rod went on to note that Gerald Mastellone had testified at deposition that he noticed the problems in both October and November 2001, "[h]ence, the statute of limitations for bringing that suit expired in October or November of 2002." Lightning Rod did, however, agree to extend the limitations period by 45 days "with regard to the alleged mold appearing on the exterior siding of the home."

{¶ 55} The undisputed facts show that Lightning Rod did not extend the limitation period for interior loss. The Mastellones did not file a claim for interior loss until 2004, well after the November 2002 cut-off date. As a matter of law, the claim for loss had not been made in conformity with the policy. The court did not err by directing a verdict on this basis.

IV

{¶ 56} In its cross-assignments of error, Lightning Rod complains that the court erred by refusing to grant a directed verdict on the Mastellones' claims for exterior mold damage, and likewise erred by denying its motion for judgment notwithstanding the verdict. It argues that (1) the Mastellones presented no evidence to show that the mold constituted a physical injury to the wood siding and (2) the policy clearly excluded mold from coverage because the Mastellones offered no evidence to show that the mold developed from either a single event or other covered loss.

A

{¶ 57} Civ.R. 50(A)(4) permits a party to ask the court to direct a verdict in its favor when after construing the evidence most strongly in favor of the party

against whom the motion is directed, the court finds upon any determinative issue that reasonable minds could come to but one conclusion, and that conclusion is adverse to the party against whom the motion is directed. Similarly, Civ.R. 50(B) permits the court to enter judgment notwithstanding the verdict when it finds the evidence to be legally insufficient to support the jury's verdict.

{¶ 58} Motions for directed verdict and judgment notwithstanding the verdict test the legal sufficiency of the evidence. In *Posin v. ABC Motor Court Hotel* (1976), 45 Ohio St.2d 271, 275, 74 O.O.2d 427, 344 N.E.2d 334, the Supreme Court stated:

{¶ 59} "The test to be applied by a trial court in ruling on a motion for judgment notwithstanding the verdict is the same test to be applied on a motion for a directed verdict. The evidence adduced at trial and the facts established by admissions in the pleadings and in the record must be construed most strongly in favor of the party against whom the motion is made, and, where there is substantial evidence to support his side of the case, upon which reasonable minds may reach different conclusions, the motion must be denied. Neither the weight of the evidence nor the credibility of the witnesses is for the court's determination in ruling upon either of the above motions." Because both motions test the legal sufficiency of the evidence, we review them de novo, with no deference to the court's decision. *Osler v. Lorain* (1986), 28 Ohio St.3d 345, 347, 28 OBR 410, 504 N.E.2d 19 (judgment notwithstanding the verdict); *Goodyear Tire & Rubber Co. v. Aetna Cas. & Sur. Co.*, 95 Ohio St.3d 512, 2002-Ohio-2842, 769 N.E.2d 835, ¶ 4 (directed verdict).

## B

### 1

{¶ 60} In a section titled "Perils Insured Against," Lightning Rod set forth two forms of coverage: Coverage A for dwellings and Coverage B for other structures. It agreed to insure against direct loss to property "only if that loss is a physical loss to property." The policy states that it does not, however, insure for loss caused by, among other things, "smog, rust or other corrosion, mold, wet or dry rot."

{¶ 61} The term "physical injury" is undefined by the policy, so we give that term its usual meaning. *Nationwide Mut. Fire Ins. Co. v. Guman Bros. Farm,* 73 Ohio St.3d 107, 108, 652 N.E.2d 684. Read in context with the other terms used in the definition of "property damage," we construe the term "physical injury" to mean a harm to the property that adversely affects the structural integrity of the house. This interpretation is consistent with authorities on insurance law. See, e.g., 10A Couch on Insurance (3d Ed.1998), Section

148:46 ("The requirement that the loss be 'physical,' given the ordinary definition of that term, is widely held to exclude alleged losses that are intangible or incorporeal, and, thereby, to preclude any claim against the property insurer when the insured merely suffers a detrimental economic impact unaccompanied by a distinct, demonstrable, physical alteration of the property"); Comment, Why Fear the Fungus: Why Toxic Mold Is and Is Not the Next Big Toxic Tort (2004), 52 Buff.L.Rev. 257, 276 (homeowners must show "distinct and demonstrable" damage to property as a result of mold growth, such as "clear physical damage to the structure of the home" to recover under a homeowner policy).

2

{¶ 62} In its motions for a directed verdict and judgment notwithstanding the verdict, Lightning Rod argued that the Mastellones failed to show direct physical loss to the exterior of the house because expert testimony showed that the mold did not attack the wood itself and could have been cleaned from the wood. The Mastellones argued that the mere existence of dark staining on the siding showed physical injury to the siding.

{¶ 63} The evidence undeniably showed mold staining on the exterior siding of the house. Contrary to the Mastellones' argument, however, the staining did not rise to the level of "physical injury" to the siding, because it was only temporary and did not affect the structure of the wood. The Mastellones' expert, Stephen Bostwick, testified that the mold could be cleaned from the siding by using a solution of bleach and trisodium phosphate. He agreed that a cleaning of the kind he described would be "adequate," although the staining would "reoccur again in short order." He did not, however, claim that the wood siding had been structurally altered such that it would need to be replaced. He stated in his report that "the only time that it would be necessary to replace the siding would be if it was on the recommendation of a certified hygienist, CIH, or physician for health concerns" and conceded at trial that he had not seen any such recommendation made for the Mastellone house.

{¶ 64} Lightning Rod's expert in paints and stains agreed with the Mastellones' expert on how to remove the mold from the exterior siding, saying that bleach "is very effective to remove the mold. It kills the mold." He suggested that a mixture of trisodium phosphate and bleach sodium or hyper chloride, in conjunction with a power washer, would do it. More importantly, he testified that the existing mold had not attacked the wood surface of the cedar siding and was growing only on the surface of the existing stain coatings. The paint and stain expert concluded his testimony by saying he could see no reason for replacing the siding because it could be cleaned and it would look like new.

{¶ 65} Another Lightning Rod expert, a coatings consultant, concurred with the paint-and-stain expert's conclusions regarding the mold's lack of damage to the siding. He stated:

{¶ 66} "I should also mention that mildew,[8] the primary concern for most building owners would be aesthetic [—] the mildew itself doesn't cause degradation of the wood substrate. If you are cleaning and repainting you are primarily doing it for aesthetics."

{¶ 67} He went on to testify that "[m]ildew that is of this nature and of the exact species that was identified does not damage the wood. It doesn't damage the wood because it doesn't feed on anything in the wood itself."

{¶ 68} We find that the Mastellones presented no evidence to show that the mold on the siding of their house constituted "physical damage" as that term is used in the policy. The presence of mold did not alter or otherwise affect the structural integrity of the siding. The experts all agreed that the mold was present only on the surface of the siding and could be removed without causing any harm to the wood. Absent any specific alteration of the siding, the Mastellones failed to show that their house suffered any direct physical injury as required by the homeowners' policy.

{¶ 69} We therefore sustain the first cross-assignment and reverse the award of damages for exterior loss to the house. It follows that any award of prejudgment interest is necessarily reversed as well, since the predicate finding of money "due and payable" under R.C. 1343.03(A) no longer exists. Hence, the Mastellones' third assignment of error is moot. See App.R. 12(A)(1)(c).

{¶ 70} The judgment is affirmed in part and reversed in part, and the cause is remanded for further proceedings consistent with this opinion.

> Judgment affirmed in part
> and reversed in part,
> and cause remanded.

COONEY, P.J., and CELEBREZZE, J., concur.

---

8. The coatings consultant had previously testified that the paint industry made no distinction between the terms "mold" and "mildew," that those terms were "one and the same. Mold is biological growth." The Mastellones' expert likewise agreed that he made no distinction between mold and mildew.