[Until this opinion appears in the Ohio Official Reports advance sheets, it may be cited as *Neuro-Communication Servs., Inc. v. Cincinnati Ins. Co.*, Slip Opinion No. 2022-Ohio-4379.]

NOTICE

This slip opinion is subject to formal revision before it is published in an advance sheet of the Ohio Official Reports. Readers are requested to promptly notify the Reporter of Decisions, Supreme Court of Ohio, 65 South Front Street, Columbus, Ohio 43215, of any typographical or other formal errors in the opinion, in order that corrections may be made before the opinion is published.

SLIP OPINION NO. 2022-OHIO-4379

NEURO-COMMUNICATION SERVICES, INC., *v.* CINCINNATI INSURANCE COMPANY ET AL.

**[Until this opinion appears in the Ohio Official Reports advance sheets, it may be cited as *Neuro-Communication Servs., Inc. v. Cincinnati Ins. Co.*, Slip Opinion No. 2022-Ohio-4379.]**

*Insurance—Contract interpretation—Term "direct loss" in commercial insurance policy requires that there be physical loss or damage to covered property—Audiology-practice owner's policy does not cover its loss of income due to closure during shutdown ordered by governor at beginning of COVID-19 pandemic—Direct physical loss or damage to property does not arise from general presence of COVID-19 in community, presence of COVID-19 on surfaces at a premises, or presence on a premises of a person infected with COVID-19.*

(No. 2021-0130—Submitted February 8, 2022—Decided December 12, 2022.)

ON ORDER from the United States District Court for the Northern District of Ohio, Eastern Division, Certifying a Question of State Law, No. 4:20-cv-01275-BYP.

**BRUNNER, J.**

**{¶ 1}** This case comes to us as a certified question from the United States District Court for the Northern District of Ohio. In the underlying litigation, the plaintiff—respondent, Neuro-Communication Services, Inc. ("Neuro")—argues that its commercial insurance policy entitles it to recover income it lost after it was forced to cease almost all operations for the first several weeks of the COVID-19 ("Covid") pandemic. Its insurers, defendants-petitioners, Cincinnati Insurance Company, Cincinnati Casualty Company, and Cincinnati Indemnity Company (collectively, "Cincinnati"), moved to dismiss the suit or, in the alternative, to have the federal court certify a question of state law to this court. *See* S.Ct.Prac.R. 9.01(A) (providing that we may answer a question of law certified to us by another court in an "order finding there is a question of Ohio law that may be determinative of the proceeding and for which there is no controlling precedent in the decisions of this Supreme Court").

**{¶ 2}** Neuro's policy is governed by Ohio law and provides coverage for a "direct 'loss' " to certain property. The federal court concluded that whether this provision covers a claim based on Covid-related business shutdowns is a question of Ohio law for which there is no controlling precedent from this court. It also observed the significance of the question, as a large number of suits seeking coverage under the same or similar language are pending in state and federal courts across Ohio, making an authoritative answer to the question desirable. The federal court therefore certified the question to this court, and we agreed to answer it. We now answer it in the negative.

## I. Background

**{¶ 3}** On March 9, 2020, the governor of Ohio declared a state of emergency in Ohio due to the outbreak of Covid. *See* Executive Order 2020-01D, available at https://governor.ohio.gov/media/executive-orders/executive-order-2020-01-d

2

(accessed Nov. 26, 2022) [https://perma.cc/NX6D-6BFN]. The order authorized personnel from state departments "to coordinate the State response to COVID-19, and to assist in protecting the lives, safety, and health of the citizens of Ohio." *Id.* It also required the director of the Ohio Department of Health ("Health Director") to "create and require the use of diagnostic and treatment guidelines and provide those guidelines to health care providers [and] institutions." *Id.* In addition, it required the Health Director to "issue guidelines for private businesses regarding appropriate work and travel restrictions, if necessary." *Id.*

{¶ 4} Over the next several weeks, the Health Director issued a number of orders, two of which are particularly relevant here. First, on March 17, 2020, the Health Director issued an order stating that "all non-essential or elective surgeries and procedures that utilized [personal protective equipment] should not be conducted." Director's Order non-essential surgery, available at https://coronavirus.ohio.gov/resources/public-health-orders/directors-order-non-essential-surgery-3-17-2020 (accessed Nov. 26, 2022). Then, on March 22, 2020, the Health Director issued an order requiring "all individuals currently living within the State of Ohio * * * to stay at home" and stating that "[a]ll persons may leave their homes or place of residence only" to participate in activities, businesses, or operations as permitted in the order. Director's Stay-at-Home Order at ¶ 1, available at https://coronavirus.ohio.gov/static/publicorders/DirectorsOrderStayAtHome.pdf (accessed Nov. 26, 2022). This order also required all nonessential businesses to "cease all activities" except as specifically identified in the order, and it imposed conditions on essential businesses and operations. *Id.* at ¶ 2. We refer to these two orders collectively as the "Shutdown Orders."

{¶ 5} Neuro owns and operates an audiology practice in northeast Ohio under the name Hearing Innovations. Neuro provides hearing and balance services to its patients, many of whom are elderly. On March 22, 2020, the American Academy of Audiology's Executive Committee stated that audiology practices are

nonessential businesses and recommended that such practices shut their doors.  In response to the Shutdown Orders, Neuro therefore ceased almost all of its operations, starting on March 23, 2020.  It began to resume its operations on May 4, 2020.

{¶ 6} Neuro holds an "all-risk" commercial-property insurance policy issued by Cincinnati.  It submitted a claim under the Building and Personal Property Coverage Form of the policy seeking coverage for the revenue it lost as a result of its complying with the Shutdown Orders.

{¶ 7} The general-coverage provision of the Building and Personal Property Coverage Form provides that Cincinnati will pay "for direct 'loss' to Covered Property at the 'premises' caused by or resulting from any Covered Cause of Loss." The term "loss" is defined as "accidental physical loss or accidental physical damage."[1]  "Covered Causes of Loss" is defined as "direct 'loss' unless the 'loss' is excluded or limited" in that part of the policy.

{¶ 8} The Building and Personal Property Coverage Form also contains a coverage extension for business income ("Business Income Extension"). Section A.5.b.1 provides: "[Cincinnati] will pay for the actual loss of 'Business Income' * * * you sustain due to the necessary 'suspension' of your 'operations' during the 'period of restoration'.  The 'suspension' must be caused by direct 'loss' to property at a 'premises' caused by or resulting from any Covered Cause of Loss." "Period of restoration" is defined as "the period of time that * * * [b]egins at the time of direct 'loss' [and] [e]nds on the earlier of: (1) [t]he date when the property at the 'premises' should be repaired, rebuilt or replaced with reasonable speed and

1. The covered "premises" are Neuro's offices in Boardman and Youngstown.  The policy identifies various types of property that qualify as "Covered Property," including the buildings in which Neuro's offices are located, permanent fixtures and machinery in the buildings, and furniture and equipment belonging to Neuro in the buildings.  It also specifically identifies property that does not constitute Covered Property.

similar quality; or (2) [t]he date when business is resumed at a new permanent location."

{¶ 9} Three other coverage extensions are also relevant:

- *Extra Expense Coverage Extension.* Section A.5.b.2 provides, "[Cincinnati will pay for] necessary expenses you sustain * * * during the 'period of restoration' that you would not have sustained if there had been no direct 'loss' to property caused by or resulting from a Covered Cause of Loss."

- *Civil Authority Coverage Extension.* Section A.5.b.3 provides, "When a Covered Cause of Loss causes damage to property other than Covered Property at a 'premises', [Cincinnati] will pay for the actual loss of 'Business Income' and necessary Extra Expense you sustain caused by action of civil authority that prohibits access to the 'premises.' "

- *Extended Business Income Coverage Extension.* Section A.5.b.6 provides that if a "suspension" of operations entitling Neuro to coverage under the Business Income Extension occurs, Cincinnati will also "pay for the actual loss of 'Business Income' [the insured] sustain[s] and Extra Expense [the insured] incur[s]" after " 'operations' are resumed."

{¶ 10} Cincinnati denied Neuro's claim. It stated that the general-coverage provision does not cover the claim, because the claim "does not involve direct, physical loss to property at [Neuro's] premises caused by a Covered Cause of Loss." Similarly, it stated that the claim does not fall within the extensions for business income and extra expense, because those provisions require that there be "direct physical loss or damage" to Covered Property and there was "no evidence of any such physical loss or damage."

{¶ 11} Neuro then filed suit in the United States District Court for the Northern District of Ohio, alleging that Cincinnati had breached the Business Income Extension as well as the Extra Expense, Civil Authority, and Extended Business Income Extensions by refusing to provide coverage for its claim. *See*

*Neuro-Communication Servs., Inc. v. Cincinnati Ins. Co.*, N.D.Ohio No. 4:20-cv-01275-BYP. Neuro also seeks to certify a nationwide class of insureds holding similar policies that have also been denied coverage for losses related to the pandemic. Overall, the complaint alleges that the Shutdown Orders caused Neuro to suffer a direct physical loss to its property by requiring it to temporarily suspend most of its operations and lose access to its property for business purposes.

{¶ 12} Cincinnati moved to dismiss the suit or, in the alternative, to certify a question of state law concerning the application of the policy to this court under S.Ct.Prac.R. 9.03(A). The federal court granted Cincinnati's motion for certification and certified the following question:

> Does the general presence in the community, or on surfaces at a premises, of the novel coronavirus known as SARS-CoV-2, constitute direct physical loss or damage to property; or does the presence on a premises of a person infected with COVID-19 constitute direct physical loss or damage to property at that premises?

We agreed to answer the question. 162 Ohio St.3d 1427, 2021-Ohio-1202, 166 N.E.3d 29.

## II. Analysis

{¶ 13} In interpreting a contract, we seek "to give effect to the intent of the parties to the agreement." *Westfield Ins. Co. v. Galatis*, 100 Ohio St.3d 216, 2003-Ohio-5849, 797 N.E.2d 1256, ¶ 11. We review an insurance contract as a whole, *Cincinnati Ins. Co. v. CPS Holdings, Inc.*, 115 Ohio St.3d 306, 2007-Ohio-4917, 875 N.E.2d 31, ¶ 7, and we presume that its language reflects the parties' intent, *Kelly v. Med. Life Ins. Co.*, 31 Ohio St.3d 130, 509 N.E.2d 411 (1987), paragraph one of the syllabus. When contractual language is clear, we look no further than

the writing itself to determine the parties' intent. *Alexander v. Buckeye Pipe Line Co.*, 53 Ohio St.2d 241, 246, 374 N.E.2d 146 (1978).

{¶ 14} The certified question we agreed to answer asks us to determine whether three factual scenarios involve "direct physical loss or damage to property." 162 Ohio St.3d 1427, 2021-Ohio-1202, 166 N.E.3d 29. That exact language does not appear in the policy, but for present purposes we understand it to refer to the general-coverage provision and the Business Income Extension. As noted above, both provisions include the term "direct 'loss,' " and the term "loss" is defined as "accidental physical loss or accidental physical damage." In our view, this language is clear and unambiguous and does not encompass any of the three factual scenarios identified in the certified question.

{¶ 15} Cincinnati argues that the policy's definition of the term "loss" as "accidental physical loss or accidental physical damage" necessarily requires that there be some physical damage to Neuro's property. To be "physical," it asserts, there must be an "actual, tangible physical alteration" of property. According to Cincinnati, neither the temporary presence of virus particles in the air or on surfaces nor the temporary presence of an infected person on Neuro's property involves any such *physical* damage or loss to any part of the premises. Cincinnati contends that these scenarios instead cause only a loss of use of a premises for the purpose of conducting business operations, and it argues that a loss of use is not covered.

{¶ 16} Neuro disagrees and argues that the term "loss" includes a loss of use. It points to dictionary definitions of the terms "physical" and "loss" and argues that they support reading the term "physical loss" as including the loss of the ability to use the physical space of its offices for business purposes. For example, the term "physical" can mean simply "material," "substantive," or "having an objective existence, as distinguished from imaginary or fictitious," and the term "loss" can mean "deprivation" and "no longer having something or having less of it than before."

{¶ 17} We agree with Cincinnati. The definition of the term "loss" is clear: for coverage to be provided, there must be loss or damage to Covered Property that is physical in nature. Such loss or damage does not include a loss of the ability to use Covered Property for business purposes.

{¶ 18} In particular, we reject Neuro's argument based on the various dictionary definitions of the terms "physical" and "loss." Specifically, by defining "loss" as a particular *type* of loss—"accidental *physical* loss or accidental *physical* damage" (emphasis added)—the policy distinguishes between losses to Covered Property that are physical and those that are nonphysical. In our view, a loss of use of a physical space falls into the latter category. As another court in Ohio considering materially identical policy language recently put it, "[a] loss of use simply is not the same as a physical loss." *Santo's Italian Café, L.L.C. v. Acuity Ins. Co.*, 15 F.4th 398, 402 (6th Cir.2021). "It is one thing for the government to ban the use of a bike or a scooter on city sidewalks; it is quite another for someone to steal it." *Id.*

{¶ 19} Our conclusion on this point is strengthened by the definition in Neuro's policy of the term "period of restoration." As noted above, the Business Income Extension provides coverage during the "period of restoration," which begins when a "direct 'loss' " occurs and ends "on the earlier of: (1) [t]he date when the property at the 'premises' should be *repaired, rebuilt or replaced * * * * *; or (2) [t]he date when business is resumed at a new permanent location." (Emphasis added.) The policy's use of the terms "repaired, rebuilt or replaced" contemplates that the "direct 'loss' " at issue involves some sort of physical alteration of Covered Property. Quoting dictionary definitions of these terms, Neuro argues that they require the period to be measured in relation to the time it takes for its property to be "restored either to its prior condition or to a 'sound or healthy state'—in other words[,] put back to its intended use." In our view, this stretches the terms "repaired, rebuilt or replaced" too far. Resuming normal business operations did

8

not require any Covered Property to be "repaired, rebuilt or replaced." It required only that the Shutdown Orders be lifted. *See Santo's* at 403 ("What the restaurant needed was an end to the ban on in-person dining, not the repair, rebuilding, or replacement of any of its property").

**{¶ 20}** Neuro also asserts that other policies now issued by Cincinnati include language specifically excluding losses caused by viruses. The absence of such an exclusion in Neuro's policy, it argues, is therefore an indication that a "direct 'loss' " to Covered Property can occur even in the absence of a physical alteration of that property. We disagree. The parol-evidence rule prohibits us from considering other agreements containing virus exclusions. Under that rule, we may not consider such evidence for the purpose Neuro seeks to use it here—to *create* ambiguity in the contract. *See Shifrin v. Forest City Ents., Inc.*, 64 Ohio St.3d 635, 638, 597 N.E.2d 499 (1992) ("If no ambiguity appears on the face of the instrument, parol evidence cannot be considered in an effort to demonstrate such an ambiguity").

**{¶ 21}** Neuro also points to its policy's Ordinance or Law exclusion, which provides that there is no coverage for any loss caused by "the enforcement of or compliance with any ordinance or law * * * [r]egulating the * * * use * * * of any building or structure." The exclusion also specifically states that it "applies whether 'loss' results from * * * [a]n ordinance or law that is enforced *even if the building or structure has not been damaged*." (Emphasis added.) According to Neuro, this statement makes clear that a loss that does not involve a physical alteration of a building can qualify as a covered "loss." We see little relevance in this provision, however, because it refers only to the "building or structure." The policy provides coverage when there is a "direct 'loss' to *Covered Property*" (emphasis added), not just when there is a direct loss to the *building or structure*. As a result, the fact that coverage for losses caused by certain ordinances or laws is excluded even when the "building or structure" has not been physically damaged tells us little about whether

a "direct 'loss' to Covered Property" must include a physical alteration of the property.

{¶ 22} Neuro also cites court decisions issued before the Covid pandemic that it argues stand for the proposition that a direct physical loss does not require a physical alteration of property. *See Murray v. State Farm Fire & Cas. Co.*, 203 W.Va. 477, 480-481, 492-493, 509 S.E.2d 1 (1998) (finding direct physical loss to house when boulders falling from property behind house had caused extensive damage to two neighboring houses and additional boulders were predicted to fall, rendering undamaged house uninhabitable); *Gregory Packaging, Inc. v. Travelers Prop. Cas. Co. of Am.*, D.N.J. No. 2:12-cv-04418, 2014 WL 6675934, *3-6 (Nov. 25, 2014) (finding direct physical loss when ammonia gas had made facility "unfit for normal human occupancy and continued use"); *Motorists Mut. Ins. Co. v. Hardinger*, 131 Fed.Appx. 823 (3d Cir.2005) (finding that direct physical loss would occur if contamination of house's well-water supply with e-coli bacteria made house uninhabitable); *TRAVCO Ins. Co. v. Ward*, 715 F.Supp.2d 699, 703, 707-711 (E.D.Va.2010), *aff'd*, 504 Fed.Appx. 251 (4th Cir.2013) (finding direct physical loss when toxic gases released by defective drywall had rendered home uninhabitable); *W. Fire Ins. Co. v. First Presbyterian Church*, 165 Colo. 34, 36-39, 437 P.2d 52 (1968) (finding direct physical loss when gasoline had accumulated around and under church and both gasoline and gasoline vapors had infiltrated and contaminated church's foundation, halls, and rooms, resulting in its being rendered uninhabitable and highly dangerous); *Widder v. La. Citizens Prop. Ins. Corp.*, 82 So.3d 294 (La.App.2011) (finding direct physical loss when lead-paint dust had migrated into home's walls, rendering it uninhabitable until gutted and remediated); *Matzner v. Seaco Ins. Co.*, Mass.Super. No. CIV. A. 96-0498-B, 1998 WL 566658, *3-4 (Aug. 12, 1998) (finding direct physical loss when carbon-monoxide buildup caused by old pipe's blocking chimney rendered unit in apartment building uninhabitable); *see also Essex Ins. Co. v. BloomSouth Flooring Corp.*, 562 F.3d

399, 401-402, 404-406 (1st Cir.2009) (finding "physical injury to tangible property" when chemical odors had emanated from newly installed carpet at commercial offices and caused headaches and other ill effects, requiring replacement of the carpet and other remedial work).

{¶ 23} We are not persuaded that these cases are analogous to the present case. As an initial matter, both *TRAVCO* and *Essex* involved policies expressly providing coverage for loss of use. *See TRAVCO* at 702, 708; *Essex* at 401, 406. Moreover, although the decisions cited by Neuro either reject or do not apply the principle that direct physical loss requires a physical alteration of property, the cases all involved an entirely different degree of harm. In each case, the property at issue was rendered uninhabitable due to a condition that was hazardous to human health. As a practical matter, the condition made the properties wholly inaccessible.

{¶ 24} The harm here is different. While shut down, Neuro's premises "contained no hazardous flaw, akin to the threat of falling rocks or seepage of poisonous fumes, which would be just as threatening to one person as to one hundred," *Cosmetic Laser, Inc. v. Twin City Fire Ins. Co.*, 554 F.Supp.3d 389, 409 (D.Conn.2021). Neuro's premises were not wholly uninhabitable. Instead, they were unsafe only to the extent that they served as an indoor space in which people could gather and Covid could be transmitted. *See id.* at 409 ("in the COVID era, being indoors is dangerous only insofar as other individuals share the space"). Therefore, Neuro's loss of the use of its premises for business purposes during the shutdown is not akin to the total loss of access to the properties at issue in the cases cited by Neuro.[2]

---

2. Neuro also cites cases involving contaminated food products. *See Gen. Mills, Inc. v. Gold Medal Ins. Co.*, 622 N.W.2d 147, 152 (Minn.App.2001) (finding coverage when cereal oats had been tainted by pesticide); *Marshall Produce Co. v. St. Paul Fire & Marine Ins. Co.*, 98 N.W.2d 280, 293-294, 256 Minn. 404 (1959) (finding coverage when food items had been barred from sale due to exposure to smoke from fire); *Netherlands Ins. Co. v. Main St. Ingredients, L.L.C.*, 745 F.3d 909, 916-917 (8th Cir.2014) (finding coverage when instant oatmeal had been recalled because it incorporated dried milk exposed to salmonella). *Gen. Mills* and *Netherlands* are unhelpful for the

{¶ 25} We thus conclude that the term "direct 'loss' " requires that there be some loss or damage to Covered Property that is physical in nature, and any potential exception to this rule for situations like those presented in *Murray*, *Gregory*, and the other cases cited above does not apply here. The term "direct 'loss' " does not include Neuro's Covid-related loss of the use of its offices for business purposes.

{¶ 26} Moreover, with respect to the three factual scenarios identified in the certified question, we conclude that direct physical loss or damage to property does not arise from (1) the general presence of Covid in the community, (2) the presence of Covid on surfaces at a premises, or (3) the presence on a premises of a person infected with Covid.

{¶ 27} The certified question as to the first and third scenarios is relatively straightforward to answer. The general presence of Covid in the community and the presence on a premises of a person infected with Covid clearly do not involve any physical alteration of Covered Property.

{¶ 28} The answer to the certified question as to the second scenario—the presence of Covid on surfaces at a premises—may seem less obvious, but once analyzed, it is not appreciably different. The parties dispute whether the fact that Covid particles may exist on property only temporarily makes a difference, debating the application of a decision of the Eighth District Court of Appeals. *See Mastellone v. Lightning Rod Mut. Ins. Co.*, 175 Ohio App.3d 23, 2008-Ohio-311, 884 N.E.2d 1130, ¶ 68 (8th Dist.) (holding that mold on house's exterior did not constitute direct physical loss, because its presence was temporary and could be removed from siding without altering house's structural integrity). We express no

---

same reason that the cases involving uninhabitable properties are unhelpful: the food products were entirely unusable. *See Gen. Mills* at 150; *Netherlands* at 911-912. And *Marshall* and *Netherlands* involved policies containing language different from the language at issue here. *See Marshall* at 410 (covering "loss or damage"); *Netherlands* at 914 (covering "[p]hysical injury to tangible property, including all resulting loss of use of that property").

opinion on that disagreement because regardless of whether Covid particles exist on property only temporarily, the mere existence of Covid particles on Covered Property does not involve any physical alteration of the property. *See Verveine Corp. v. Strathmore Ins. Co.*, 184 N.E.3d 1266, 1276, 499 Mass. 534 (2022) ("mere 'presence' [of the virus] does not amount to loss or damage to the property").

**{¶ 29}** Finally, we note that the conclusion we reach here is consistent with the clear trend in the law in other jurisdictions. Many other state and federal courts considering insurance claims for business losses due to Covid and related shutdown orders have concluded that the mere loss of use of a premises does not constitute a direct physical loss. *See, e.g.*, *Uncork & Create, L.L.C. v. Cincinnati Ins. Co.*, 27 F.4th 926, 933-934 (4th Cir.2022) (citing decisions of United States Court of Appeals for Second, Fifth, Sixth, Seventh, Eighth, Ninth, Tenth, and Eleventh Circuits applying various states' laws); *Wakonda Club v. Selective Ins. Co. of Am.*, 973 N.W.2d 545, 554 (Iowa 2022), fn. 5 (citing state-court decisions). A few courts have reached conclusions that support Neuro's position. *See, e.g.*, *Huntington Ingalls Industries, Inc. v. Ace Am. Ins. Co.*, 2022 VT 45, __ A.3d __, ¶ 42, 48; *Ungarean v. CNA & Valley Forge Ins. Co.*, __ A.3d __, 2022 Pa.Super. 204, 2022 WL 17334365, *5-10 (2022). But many of them are trial courts, which are subject to appellate review, and at least two of the main decisions Neuro relies on have since been vacated, *see Henderson Rd. Restaurant Sys., Inc. v. Zurich Am. Ins. Co.*, 513 F.Supp.3d 808 (N.D.Ohio 2021), *vacated and remanded sub nom. In re Zurich Am. Ins. Co.*, 6th Cir. No. 21-0302, 2021 WL 4473398 (Sept. 29, 2021); *North State Deli, L.L.C. v. Cincinnati Ins. Co.*, N.C.Super.Ct. No. 20-CVS-02569, 2020 WL 6281507 (Oct. 9, 2020), *rev'd*, 2022-NCCOA-455, 875 S.E.2d 590 (N.C.App.2022).

### III. Conclusion

**{¶ 30}** For the above reasons, we answer the certified question in the negative.

So answered.

O'CONNOR, C.J., and KENNEDY, FISCHER, DEWINE, and STEWART, JJ., concur.

DONNELLY, J., dissents, with an opinion.

_____

**DONNELLY, J., dissenting.**

{¶ 31} This court should answer questions of law certified by a federal court only if "there is a question of Ohio law that may be determinative of the proceeding and for which there is no controlling precedent in the decisions of this Supreme Court." S.Ct.Prac.R. 9.01(A). This court already has a well-established body of jurisprudence on basic contract interpretation. The federal courts can seek guidance there to resolve the dispute between the parties to this case.

{¶ 32} I would dismiss this certified question of state law as having been improvidently accepted, and I therefore dissent.

_____

Berger Montague, P.C., and Yechiel Michael Twersky; and Spangenberg, Shibley & Liber, L.L.P., and Nicholas A. DiCello, for respondent.

Baker & Hostetler, L.L.P., Michael K. Farrell, Daniel M. Kavouras, and Rodger L. Eckelberry; and Litchfield Cavo, L.L.P., Daniel G. Litchfield, and Laurence J.W. Tooth, for petitioners.

Reed Smith, L.L.P., James M. Doerfler, John N. Ellison, and Richard P. Lewis, in support of respondent for amicus curiae United Policyholders.

Rutter & Russin, L.L.C., and Robert P. Rutter, in support of respondent for amicus curiae Francois, Inc.

Jenner & Block, L.L.P., Gabriel K. Gillett, and Rebecca R. Fate, in support of respondent for amici curiae Restaurant Law Center and Ohio Restaurant Association.

Wolterman Law Office, L.P.A., Matthew C. Metzger, and Steven R. Wolterman; and Markovits, Stock & DeMarco, L.L.C., Terence R. Coates, W.B. Markovits, Justin C. Walker, and Zachary C. Schaengold, in support of respondent for amici curiae Queens Tower Restaurant, Inc., d.b.a. Primavista and Taste of Belgium, L.L.C.

Calfee, Halter & Griswold, L.L.P., and K. James Sullivan, in support of respondent for amici curiae SITE Centers Corp., Brentwood Healthcare Enterprises, L.L.C., and Strang Corporation.

Rutter & Russin, L.L.C., Robert P. Rutter, and Robert A. Rutter, in support of respondent for amici curiae Steelial Welding & Metal Fabrication, Inc.; Ohio Hotel & Lodging Association; Scioto Society, d.b.a. Tecumseh Outdoor; Fish Furniture; Dayton Coatings Technology; and Somco, L.L.C., d.b.a. J3 Clothing Company.

Plevin & Gallucci, Co., L.P.A., and Frank L. Gallucci III; Weisman, Kennedy & Berris Co., L.P.A., R. Eric Kennedy, Daniel P. Goetz, and Brian E. Roof; and Bashein & Bashein Co., L.P.A., W. Craig Bashein, and John P. Hurst, in support of respondent for amicus curiae Kanan Enterprises, Inc., d.b.a. King Nut and Brennan Industries, Inc.

Susman Godfrey, L.L.P., William R.H. Merrill, Burton S. DeWitt, Seth Ard, and Marc M. Seltzer; DiCello, Levitt, Gutzler, L.L.C., Adam J. Levitt, Kenneth P. Abbarno, and Mark A. DiCello; the Lanier Law Firm, P.C., and Mark Lanier; and Burns, Bowen, Bair, L.L.P., and Timothy W. Burns, in support of respondent for amicus curiae Bridal Expressions, L.L.C.

Crowell & Moring, L.L.P., Daniel W. Wolff, and Laura A. Foggan, in support of petitioners for amici curiae American Property Casualty Insurance Association and National Association of Mutual Insurance Companies.

Bricker & Eckler, L.L.P., Drew H. Campbell, David K. Stein, and Anne Marie Sferra; and BatesCarey, L.L.P., and Adam H. Fleischer, in support of petitioners for amicus curiae State Automobile Mutual Insurance Company.

Koehler Fitzgerald, L.L.C., and Timothy J. Fitzgerald, in support of petitioners for amicus curiae Ohio Insurance Institute.

Carpenter, Lipps & Leland, L.L.P., Michael H. Carpenter, and Michael N. Beekhuizen, in support of petitioners for amicus curiae Nationwide Mutual Insurance Company.

_____