**[Cite as *Cincinnati Ins. Cos. v. Motorists Mut. Ins. Co.*, 2014-Ohio-3864.]**

| | | |
|---|---|---|
| STATE OF OHIO | ) | IN THE COURT OF APPEALS |
| | )ss: | NINTH JUDICIAL DISTRICT |
| COUNTY OF MEDINA | ) | |

THE CINCINNATI INSURANCE
COMPANIES

      Appellant

      v.

MOTORISTS MUTUAL INSURANCE
COMPANY

      Appellee

C.A. No.     13CA0016-M


APPEAL FROM JUDGMENT
ENTERED IN THE
COURT OF COMMON PLEAS
COUNTY OF MEDINA, OHIO
CASE No.    11CIV1838

DECISION AND JOURNAL ENTRY

Dated: September 8, 2014

---

BELFANCE, Judge.

{¶1}  Plaintiff-Appellant The Cincinnati Insurance Companies ("Cincinnati") appeals the decision of the Medina County Court of Common Pleas granting the motion for summary judgment of Defendant-Appellee Motorists Mutual Insurance Company ("Motorists") on Cincinnati's re-filed complaint for contribution.  For the reasons set forth below, we reverse.

I.

{¶2}  G&S Electric, Inc. ("G&S") installed electrical wiring and lighting in the Witscheys' house at 1572 Lantern Hill Drive in Wadsworth during its construction.  From September 30, 2000 to April 1, 2004, which included the period of time during which G&S was doing work at the Witscheys' home, Cincinnati provided insurance to G&S via a commercial general liability policy ("CGL policy") and an umbrella policy.  From March 30, 2004, to

October 1, 2005, Motorists provided insurance to G&S via a CGL policy.[1] Subsequent to October 1, 2005, G&S went out of business.

{¶3} On October 6, 2006, after the Witscheys had occupied the home for over three years, a fire broke out in the residence. At the time of the fire, Nationwide Mutual Fire Insurance Company ("Nationwide") insured the Witscheys' residence through a homeowner's policy. Nationwide paid to, or on behalf of, the Witscheys over $882,000 to compensate them for the damages caused by the fire. In 2007, Nationwide filed suit seeking to recover from several people and entities, including G&S, the money it paid the Witscheys. The Nationwide complaint alleged that "[t]he Defendants were negligent in the construction and installation of the electrical wiring which negligence was the proximate cause of the damages sued for in this lawsuit[,]" and that "the electrical wiring that was installed by Defendants malfunctioned and caused a fire."

{¶4} Initially, both Cincinnati and Motorists refused to defend or indemnify G&S because the fire occurred outside the respective policy periods. Thus, G&S retained an attorney to represent it in the litigation. However, subsequent to this Court's decision in *Ohio Cas. Ins. Co. v. Hanna*, 9th Dist. Medina Nos. 07CA0016-M, 07CA017-M, 2008-Ohio-3203, Cincinnati reconsidered its position and concluded that, pursuant to *Hanna*, Cincinnati owed G&S a defense. Motorists continued to maintain that it had no duty to defend or indemnify. Ultimately, Cincinnati, on behalf of G&S, settled the suit with Nationwide for $100,000.

---

[1] We note that varying dates are used in the record to describe the effective dates and end dates of the policies. However, irrespective of whether this Court has accurately reflected the precise dates of Cincinnati's and Motorists' policies, the parties do not dispute that neither Cincinnati nor Motorists insured G&S at the time of the fire, and the dispute in this appeal centers upon that fact, and not the precise dates of the policies.

**{¶5}** In December 2011, Cincinnati re-filed a complaint seeking contribution from Motorists. Cincinnati asserted claims for declaratory relief and breach of contract and sought to have Motorists pay Cincinnati 75% of the settlement costs, attorney fees, costs, and interest. Both Cincinnati and Motorists moved for summary judgment. Cincinnati moved on the basis that language in the policy and complaint, as well as case law, supported the conclusion that Motorists owed a duty to defend G&S.[2] Motorists moved for summary judgment on the basis that the opinion of Cincinnati's expert, Ralph Dolence, should be excluded, and that without that opinion, Motorists argued that Cincinnati could not demonstrate that property damage occurred during the policy period.

**{¶6}** In denying both motions, the trial court concluded that Motorists' policy did not "provide coverage to G&S for the property damage sustained by the Witscheys in 2006 because that damage didn't occur during the policy period." The trial court then ordered Motorists to file a motion for summary judgment based upon the language of the policy, which Motorists did. Thereafter, the trial court granted Motorists' motion. Cincinnati has appealed, raising a single assignment of error for our review.

II.

ASSIGNMENT OF ERROR

THE TRIAL COURT ERRED WHEN IT GRANTED SUMMARY JUDGMENT IN FAVOR OF MOTORISTS MUTUAL INSURANCE COMPANY AND DENIED SUMMARY JUDGMENT IN FAVOR OF THE CINCINNATI INSURANCE COMPANIES.

**{¶7}** Cincinnati asserts that the trial court erred in granting summary judgment to Motorists and in overruling Cincinnati's summary judgment motion. Specifically, Cincinnati

---

[2] Cincinnati also argued that Motorists owed a duty to indemnify under the policy, however, the focus of this appeal is upon whether there existed a duty to defend under the Motorists policy.

argues that the trial court erred in concluding that Motorists did not have a duty to defend G&S and erred in thereby concluding that Cincinnati was not entitled to contribution after it settled the litigation with Nationwide.

{¶8} This Court reviews an award of summary judgment de novo. *Grafton v. Ohio Edison Co.*, 77 Ohio St.3d 102, 105 (1996). "We apply the same standard as the trial court, viewing the facts of the case in the light most favorable to the non-moving party and resolving any doubt in favor of the non-moving party." *Garner v. Robart*, 9th Dist. Summit No. 25427, 2011-Ohio-1519, ¶ 8.

{¶9} Pursuant to Civ.R. 56(C), summary judgment is appropriate when:

(1) No genuine issue as to any material fact remains to be litigated; (2) the moving party is entitled to judgment as a matter of law; and (3) it appears from the evidence that reasonable minds can come to but one conclusion, and viewing such evidence most strongly in favor of the party against whom the motion for summary judgment is made, that conclusion is adverse to that party.

*Temple v. Wean United, Inc.*, 50 Ohio St.2d 317, 327 (1977). To succeed on a summary judgment motion, the movant bears the initial burden of demonstrating that there are no genuine issues of material fact concerning an essential element of the opponent's case. *Dresher v. Burt*, 75 Ohio St.3d 280, 292 (1996). If the movant satisfies this burden, the nonmoving party "'must set forth specific facts showing that there is a genuine issue for trial.'" *Id*. at 293, quoting Civ.R. 56(E).

{¶10} The Supreme Court of Ohio has held that "the duty to defend is broader than and distinct from the duty to indemnify." *Ward v. United Foundries, Inc.,* 129 Ohio St.3d 292, 2011-Ohio-3176, ¶ 19.

"The test of the duty of an insurance company, under a policy of liability insurance, to defend an action against an insured, is the scope of the allegations of the complaint in the action against the insured, and where the complaint brings the

action within the coverage of the policy the insurer is required to make a defense, regardless of the ultimate outcome of the action or its liability to the insured."

*Willoughby Hills v. Cincinnati Ins. Co.,* 9 Ohio St.3d 177, 178-179, quoting *Motorists Mut. v. Trainor,* 33 Ohio St.2d 41 (1973), paragraph two of the syllabus. "'[T]he duty to defend need not arise solely from the allegations in the complaint but may arise at a point subsequent to the filing of the complaint.'" *Cincinnati Ins. Co. v. Anders,* 99 Ohio St.3d 156, 2003-Ohio-3048, ¶ 18, quoting *Willoughby Hills* at 179. "[T]he pleadings alone may not provide sufficient factual information to determine whether the insurer has an obligation to defend the insured." *Willoughby Hills* at 180. "[W]here the insurer's duty to defend is not apparent from the pleadings in the case against the insured, but the allegations do state a claim which is potentially or arguably within the policy coverage, or there is some doubt as to whether a theory of recovery within the policy coverage had been pleaded, the insurer must accept the defense of the claim." *Id.* "Thus, the 'scope of the allegations' may encompass matters well outside the four corners of the pleadings." *Id.* "But if all the claims are clearly and indisputably outside the contracted coverage, the insurer need not defend the insured." *Ward* at ¶ 19.

{¶11} The Nationwide complaint alleged that the Witscheys hired Galehouse Construction Company to construct their home and that Galehouse Construction Company hired G&S "to install the electrical wiring and lighting in the Witscheys' home." The complaint further asserted that G&S was in the business of, and represented itself as an expert in, "the installation and maintenance of residential electrical wiring and services." It was alleged that "[t]he Defendants were negligent in the construction and installation of the electrical wiring which negligence was the proximate cause of the damages sued for * * *." The complaint stated that "[o]n October 6, 2006, the electrical wiring that was installed by Defendants malfunctioned and caused a fire [which] * * * significantly consumed the Witscheys' home and destroyed or

substantially damaged many of the personal items, including furniture, works of art, clothing, appliances and the like." According to Nationwide, the damages "were the direct and proximate result of negligence, breach of contract, and/or breach of warranty on the part of" G&S and that "Nationwide paid over to or on behalf of [the] Witschey[s] the sum of $882,906.93 for the replacement of their home and contents as well as for temporary living accommodations while their home was being repaired."

{¶12} The relevant portions of both Cincinnati's and Motorists' CGL policies contain nearly identical language. Motorists' policy states that:

> We will pay those sums that the insured becomes legally obligated to pay as damages because of "bodily injury" or "property damage" to which this insurance applies. We will have the right and duty to defend the insured against any "suit" seeking those damages. However, we will have no duty to defend the insured against any "suit" seeking damages for "bodily injury" or "property damage" to which this insurance does not apply. We may, at our discretion, investigate any "occurrence" and settle any claim or "suit" that may result.
>
> * * * This insurance applies to "bodily injury" and "property damage" only if:
>
> (1) The "bodily injury" or "property damage" is caused by an "occurrence" that takes place in the "coverage territory";
>
> (2) The "bodily injury" or "property damage" occurs during the policy period; and
>
> (3) Prior to the policy period, no insured listed under Paragraph 1. of Section II – Who Is An Insured and no "employee" authorized by you to give or receive notice of an "occurrence" or claim, knew that the "bodily injury" or "property damage" had occurred, in whole or in part. If such a listed insured or authorized "employee" knew, prior to the policy period, that the "bodily injury" or "property damage" occurred, then any continuation, change or resumption of such "bodily injury" or "property damage" during or after the policy period will be deemed to have been known prior to the policy period.

{¶13} The policy defines the following terms that are relevant to this decision:

> "Occurrence" means an accident, including continuous or repeated exposure to substantially the same general harmful conditions.
>
> * * * "Property damage" means: a. Physical injury to tangible property, including all resulting loss of use of that property. All such loss of use shall be deemed to

occur at the time of the physical injury that caused it; or b. Loss of use of tangible property that is not physically injured. All such loss of use shall be deemed to occur at the time of the "occurrence" that caused it.

{¶14} At the outset of the Nationwide litigation, which was filed in December 2007, both Cincinnati and Motorists maintained that they did not owe a duty to defend because the complaint alleged that the property damage, i.e. the fire, occurred outside the policy period. It appears that, prior to even filing suit, Nationwide hired an expert, Ralph Dolence, to investigate the cause of the fire, and his report, dated July 26, 2007, is part of this Court's record. While it is unclear whether his report was filed in the Nationwide litigation, it is clear that the contents of the report were available to the parties in the Nationwide litigation, as Mr. Dolence's report is discussed during his 2009 deposition and it was marked as an exhibit during that deposition. Mr. Dolence opined in his 2007 report that the fire began in the concealed ceiling space in the kitchen and was caused by the electrical failure of a light in the kitchen caused by high resistance heating that "ignited combustible materials in close proximity[.]" The high resistance heating in turn "was caused by cable damage during installation from insulation degradation during installation and securing of the cable and wiring at the fixture."

{¶15} Cincinnati reconsidered its position after this Court's decision in *Hanna*. Based on *Hanna,* Cincinnati concluded that it owed G&S a defense because it believed that the *Hanna* Court adopted a continuous trigger approach which would, barring other restrictions in the policy, require coverage in cases in which collateral damages occurring outside the policy period (such as the fire) were caused by initial and consequential damage that occurred during the policy period (such as the gradual degradation of the insulation and surrounding structures). *See Hanna,* 2008-Ohio-3203, at ¶ 19 ("There is no requirement in the policy that collateral damages flowing from the initial 'property damage' must occur during the policy period."). It appears

that the Court's decision in *Hanna* caused Cincinnati to reexamine the complaint and evidence and conclude that it was possible there was property damage during the policy period if the fire was caused by high resistance heating that caused a gradual degradation of the wire and surrounding structures.

{¶16} Motorists continued to maintain that it had no duty to defend notwithstanding *Hanna* because the fire occurred outside the policy period. In the instant litigation, Motorists suggests that, even if *Hanna* recognized that, in cases involving ongoing damage to property, policy coverage may be apportioned among insurers,[3] *Hanna* was effectively overruled by the Supreme Court of Ohio in *Westfield Ins. Co. v. Custom Agri Sys., Inc.*, 133 Ohio St.3d 476, 2012-Ohio-4712. *Westfield* involved a certified question from the Sixth Circuit Court of Appeals. *Westfield* at ¶ 6. In *Westfield*, the Supreme Court noted that "all of the claims against which Westfield [wa]s being asked to defend and indemnify Custom relate[d] to Custom's work itself, i.e., the alleged defective construction of and workmanship on the steel grain bin." *Id.* at ¶ 11. Thus, the question answered by the Court was whether "claims of defective construction/workmanship brought by a property owner [were] claims for 'property damage'

---

[3] In analyzing these varying approaches, under circumstances of ongoing damage where the insured is covered by multiple insurers, the concept of shared liability is grounded in the notion that it is fair to apportion the coverage among all insurers rather than requiring only one insurer to shoulder all of the burden. In addition, allowing liability insurance companies to escape defense and coverage under these circumstances could result in innocent third parties being unable to recover or require a company like G&S to maintain coverage long after it ceased doing business. *See Plum v. W. Am. Ins. Co.,* 1st Dist. Hamilton No. C-050115, 2006-Ohio-452, ¶ 20. However, public policy favors ensuring that innocent third-parties are able to recover. 7 Maldonado, Rogers, and Plitt, *Couch on Ins.*, Section 101:18 (3d Ed.2014). Thus, it makes sense that "there are significant differences between first party and third-party insurance contexts that tend to make for a more lenient application of the threshold trigger in liability insurance contexts[.]" 10A *Couch* at Section 148:46.

caused by an 'occurrence' under a commercial general liability policy[.]" *Id.* at ¶ 6. In holding that "[c]laims of defective construction or workmanship brought by a property owner are not claims for 'property damage' caused by an 'occurrence' under a commercial general liability policy[,]" *id.* at syllabus, the Court stated that CGL "'policies do not insure an insured's work itself; rather, the policies generally insure consequential risks that stem from the insured's work.'" *Id.* at ¶ 10, quoting *Heile v. Herrmann,* 136 Ohio App.3d 351, 353 (1st Dist.1999). It does not appear that *Hanna* would be altered by *Westfield.* In the instant matter, Nationwide's complaint sought damages caused by the fire, not damages caused directly by G&S' allegedly defective work. In other words, the complaint did not exclusively seek to recover damages stemming from G&S's work in installing the lighting. Rather, it sought damages from the consequential risks that stemmed from the work of G&S. Accordingly, we cannot say that Motorists' duty to defend is negated by *Westfield.*[4]

{¶17} The trial court in its entry essentially concluded that Motorists did not owe a duty to defend because there was no property damage during the policy period, as all the property damage occurred on October 6, 2006, during the fire, after the expiration of both Cincinnati's and Motorists' policies. In doing so, it appears that the trial court was focused on the ultimate

---

[4] We note that it is not quite clear what the underlying claims were in the suit between the Hannas and the construction company, Quality Home Construction Inc. ("Quality") that initiated the litigation between Quality and its insurers. *See Hanna,* 2008-Ohio-3203, at ¶ 5. Even assuming some of the Hannas' claims involved defective construction, which would presumably be barred by the holding in *Westfield,* based on language in *Hanna,* it is also clear that much of the damages being sought were for consequential risks stemming from Quality's work. *See Hanna* at ¶ 19. It does not appear those portions of *Hanna* would be altered by *Westfield.* Likewise, to the extent that some of the complaint in this matter sought damages that would be improper under *Westfield*, such would not negate the duty to defend where some of the allegations in the complaint potentially or arguably fall within the policy coverage. *See Sharonville v. Am. Emps. Ins. Co.,* 109 Ohio St.3d 186, 2006-Ohio-2180, ¶ 13 ("Once an insurer must defend one claim within a complaint, it must defend the insured on all the other claims within the complaint, even if they bear no relation to the insurance-policy coverage.").

issue of liability as opposed to whether the allegations of the Nationwide complaint would require Motorists to defend. However, we are mindful that the Supreme Court in *Willoughby Hills* stated that, "where the insurer's duty to defend is not apparent from the pleadings in the case against the insured, but the allegations do state a claim which is potentially or arguably within the policy coverage, or there is some doubt as to whether a theory of recovery within the policy coverage had been pleaded, the insurer must accept the defense of the claim." *Willoughby Hills,* 9 Ohio St.3d at 180. The trial court's entry suggests that it concluded that, because there were no express allegations that there was property damage during the policy period, there could be no coverage under the policy. It failed to examine, however, whether the allegations of the complaint would exclude the possibility of there being property damage during the policy period. *See id.* ("[T]he 'scope of the allegations' may encompass matters well outside the four corners of the pleadings.").

{¶18} Motorists' policy indicates that it "will pay those sums that the insured becomes legally obligated to pay as damages *because of* 'bodily injury' or 'property damage' to which this insurance applies. [It] will have the right and duty to defend the insured against any 'suit' seeking those damages." (Emphasis added.) Thus, the question is whether the Nationwide suit sought damages due to, or caused by, property damage to which the insurance applied. In turn, that requires considering whether there was property damage during the policy period caused by an occurrence. If there was, the fire could be viewed as the consequential damages resulting from the property damage, to which the insurance would apply. *See Hanna* at ¶ 19 (noting that collateral damages that occur as a result of the initial property damage do not have to occur during the policy period). The term property damage is defined by the policy as either "[p]hysical injury to tangible property, including all resulting loss of use of that property[,]" or

the "[l]oss of use of tangible property that is not physically injured." "Physical injury to tangible property" is not defined in this policy. While this Court used the definition applied by the Eighth District Court of Appeals in *Hanna,* we cannot say that such is the only possible definition applicable.[5] Generally, physical injury to tangible property contemplates damage to property that is either real or personal; the only requirement being that the property is "corporeal." 9 Plitt, Maldonado, Rogers, and Plitt, *Couch on Ins.*, Section 126:35 (3d Ed.2014). Thus, in accordance with that concept, "the vast majority of jurisdictions hold that pure economic loss, such as loss of profits, loss of good will, or loss of benefits, is not damage or injury to tangible property." *Id.* at Section 126:36.

{¶19} It is unclear from the complaint whether there was any "property damage" as defined by Motorists' policy during the policy period caused by an occurrence. However, the allegations of the complaint certainly do not exclude the possibility that property damage was occurring during Motorists' policy period because it is unclear from the complaint what, if anything, was occurring between the time the wiring was negligently installed and the time of the fire. While certainly the complaint makes it clear that Nationwide is seeking damages due to the fire, the complaint does not exclude the possibility that the damage from the fire was consequential damage flowing from damage occurring from the faulty installation. The mere fact that the complaint does not indicate that property damage was occurring during the policy period does exclude the possibility that it was under circumstances in which the complaint offers no explanation as to what was occurring in the house from the point of the faulty installation of

---

[5] The definition used in *Hanna* was "'a harm to the property that adversely affects the structural integrity of the house.'" *Hanna* at ¶ 10, quoting *Mastellone v. Lightning Rod Mut. Ins. Co.,* 175 Ohio App.3d 23, 2008-Ohio-311, ¶ 61 (8th Dist.).

the wiring by G&S to the point of the fire. Thus, at the outset of the complaint, Motorists could not have known that there was no property damage to which the insurance would apply.

{¶20} The Nationwide complaint does not specify the precise date that construction and installation of the wiring took place, but does indicate that construction occurred sometime before October 6, 2006. The complaint contains allegations that G&S installed the wiring in the house, the wiring malfunctioned, ultimately causing the fire and resultant damage. In examining the complaint at the outset of the Nationwide litigation and the relevant policy provisions, we cannot conclude that the "claims are clearly and indisputably outside the contracted coverage." *Ward,* 129 Ohio St.3d 292, 2011-Ohio-3176, at ¶ 19. We emphasize that the defective installation itself cannot be considered an accident, and thus cannot be considered an occurrence under the policy. *See Hanna,* 2008-Ohio-3203, at ¶ 16; *Westfield* at ¶ 18-19, quoting *Essex Ins. Co. v. Holder,* 370 Ark. 465, 261 (2008) (quoting with approval an Arkansas Supreme Court case that held that "'defective workmanship standing alone – resulting in damages only to the work product itself – is not an occurrence under a CGL policy[]'"). However, at the time the complaint was filed, it was possible that property damage occurred during the policy period and was of a continuous nature such that coverage could be implicated under the policy.[6] In essence, while the complaint does not allow one to indisputably conclude that coverage exists under the policy, the complaint is broad enough whereby coverage could be possible under the policy. The

---

[6] As a practical matter, given that complaints are merely required to contain a short, plain statement setting forth entitlement to relief, in most cases, an insurer will need to conduct further investigation so as to determine whether the claims at issue are outside the contracted coverage. For this reason, most insurance policies contain reservation of rights provisions, such that the insurer may undertake the investigation and defense of the matter but may later conclude that no coverage is warranted.

language of the complaint does not exclude the possibility that the fire was the consequence of ongoing and continuous property damage that occurred subsequent to the faulty installation of the wiring. Because "the allegations do state a claim which is potentially or arguably within the policy coverage," absent the applicability of an exclusion, Motorists was required to provide a defense. *Willoughby Hills,* 9 Ohio St.3d at 180.

**{¶21}** Further, we note that as the Nationwide litigation continued, Mr. Dolence was deposed and his expert report was available at that deposition. In that deposition, Mr. Dolence indicated that "[e]very time [the Witscheys] used that light with the resistance heating you lower the ignition temperature of the wood around it. That's pyrophoric charring or pyrophoric degradation. You keep charring and burning that wood * * * [and y]ou dry it out and you lower its ignition temperature to the point in time that it ignites." Accordingly, as the Nationwide litigation continued, instead of dispelling the notion that Motorists owed a duty to defend, the evidence tended to provide more support for the proposition that there was coverage under the policy, i.e. that there was a possibility that there was property damage (i.e. ongoing charring and degradation of the wood thereafter igniting) during the policy period. *See Anders,* 99 Ohio St.3d 156, 2003-Ohio-3048, at ¶ 18, quoting *Willoughby Hills* at 179 ("'[T]he duty to defend need not arise solely from the allegations in the complaint but may arise at a point subsequent to the filing of the complaint.'").

**{¶22}** We note that, in Motorists' initial motion in opposition to Cincinnati's motion for summary judgment, Motorists' asserted two exclusions applied that negated its duty to defend. However, because the trial court concluded, even without considering the exclusions, that there was no duty to defend or indemnify under the policy because the property damage did not occur during the policy period, the trial court never addressed whether any exclusions would relieve

Motorists from the duty to defend. This Court is not inclined to resolve that issue in the first instance. *See Neura v. Goodwill Industries,* 9th Dist. Medina No. 11CA0052-M, 2012-Ohio-2351, ¶ 19.

{¶23} We sustain Cincinnati's assignment of error to the extent that it asserts that the trial court erred in granting summary judgment to Motorists.

### III.

{¶24} In light of the foregoing, we reverse the judgment of the Medina County Court of Common Pleas and remand the matter for proceedings consistent with this opinion.

Judgment reversed,
and cause remanded.

———

There were reasonable grounds for this appeal.

We order that a special mandate issue out of this Court, directing the Court of Common Pleas, County of Medina, State of Ohio, to carry this judgment into execution. A certified copy of this journal entry shall constitute the mandate, pursuant to App.R. 27.

Immediately upon the filing hereof, this document shall constitute the journal entry of judgment, and it shall be file stamped by the Clerk of the Court of Appeals at which time the period for review shall begin to run. App.R. 22(C). The Clerk of the Court of Appeals is instructed to mail a notice of entry of this judgment to the parties and to make a notation of the mailing in the docket, pursuant to App.R. 30.

Costs taxed to Appellee.

EVE V. BELFANCE
FOR THE COURT

MOORE, P. J.
CONCURS.

CARR, J.
CONCURS IN JUDGMENT ONLY.


APPEARANCES:

STEPHEN J. CHUPARKOFF, Attorney at Law, for Appellant.

MICHAEL M. NELTNER, Attorney at Law, for Appellant.

R. BRIAN BORLA and JOHN R. CHLYSTA, Attorneys at Law, for Appellee.