RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)
File Name: 21a0224p.06

# UNITED STATES COURT OF APPEALS

### FOR THE SIXTH CIRCUIT

─────────────────

SANTO'S ITALIAN CAFÉ LLC,

  *Plaintiff-Appellant*,

  *v.*

ACUITY INSURANCE COMPANY,

  *Defendant-Appellee*.

No. 21-3068

─────────────────

Appeal from the United States District Court for the Northern District of Ohio at Cleveland.
No. 1:20-cv-01192—Pamela A. Barker, District Judge.

Argued: September 16, 2021

Decided and Filed: September 22, 2021

Before: SUTTON, Chief Judge; BATCHELDER and LARSEN, Circuit Judges.

─────────────────

### COUNSEL

**ARGUED:** Colin P. Sammon, SAMMON LAW, LLC, Medina, Ohio, for Appellant. John R. Chlysta, HANNA, CAMPBELL & POWELL, LLP, Akron, Ohio, for Appellee. John N. Ellison, REED SMITH LLP, New York, New York, Stephen E. Goldman, ROBINSON & COLE LLP, Hartford, Connecticut, for Amici Curiae. **ON BRIEF:** Colin P. Sammon, SAMMON LAW, LLC, Medina, Ohio, for Appellant. John R. Chlysta, Kenneth A. Calderone, HANNA, CAMPBELL & POWELL, LLP, Akron, Ohio, for Appellee. John N. Ellison, REED SMITH LLP, New York, New York, Christopher E. Kozak, PLEWS SHADLEY RACHER & BRAUN LLP, Indianapolis, Indiana, Wystan M. Ackerman, ROBINSON & COLE LLP, Hartford, Connecticut, Gabriel K. Gillett, JENNER & BLOCK, LLP, Chicago, Illinois, Timothy J. Fitzgerald, KOEHLER FITZGERALD LLC, Cleveland, Ohio, for Amici Curiae.

—————————

**OPINION**

—————————

SUTTON, Chief Judge.  Santosuossos is an Italian restaurant in Medina, Ohio.  The COVID-19 pandemic was not good for the restaurant's business or for that matter most hospitality services.  First came an understandable reluctance by patrons to enter enclosed public spaces such as restaurants.  Then came the State of Ohio's order to suspend all in-person dining operations at restaurants to slow the spread of the virus.  Through it all, Santosuossos lost considerable revenue and understandably blamed the pandemic and shut-down order for its economic woes.  The owner of the restaurant sued its insurer, Acuity Insurance Company, for coverage under its commercial property insurance policy, which covers business interruption "caused by direct physical loss of or damage to property." R.7-7 at 29.  The district court granted Acuity's motion to dismiss, reasoning that the policy did not cover this kind of peril.  We agree and affirm.

I.

In March 2020, the Governor of Ohio declared a state of emergency in connection with the COVID-19 pandemic.  A few days later, the Director of the Ohio Department of Health ordered restaurants across the State to close their doors to in-person diners.  The order forced Santosuossos "to halt ordinary operations." R.1-1 at 3.  Although the closure order permitted restaurants to offer takeout services, in-person dining generates the "substantial majority of [Santosuossos's] revenue." *Id.*  The restaurant sustained significant losses and laid off employees as a result of the order.

The owner of the restaurant, Santo's Italian Café LLC, filed a claim with its insurance company, Acuity, seeking recovery under its commercial property insurance policy.  After Acuity denied coverage, the owner filed a complaint in Ohio state court, seeking a declaration that required Acuity to reimburse it for the income lost while the closure orders were in place.  Acuity removed the lawsuit to federal court and filed a motion to dismiss for failure to state a claim. *See* Fed. R. Civ. P. 12(b)(6).  The district court granted the motion, reasoning that the policy did not cover lost income attributable to the pandemic and any shut-down orders.

II.

Ohio law governs this dispute.  An insurance policy amounts to a contract, the meaning of which presents a question of law.  *Lager v. Miller-Gonzalez*, 896 N.E.2d 666, 669 (Ohio 2008).  In Ohio, as in all States (we expect), the state courts construe the terms of a contract in accordance with their conventional meaning.  *Laboy v. Grange Indem. Ins. Co.*, 41 N.E.3d 1224, 1227 (Ohio 2015).

The text of the policy answers the question at hand.  Two big-picture provisions initially orient the policy.  At the outset, it says that "[w]e will pay for direct physical loss of or damage to Covered Property . . . caused by or resulting from any Covered Cause of Loss."  R.7-7 at 25.  It then says that, with respect to "Covered Causes of Loss," the policy applies to "Risks of Direct Physical Loss."  *Id.* at 26.

Later, it provides eighteen "Additional Coverages," one of which includes coverage for "Business Income and Extra Expense."  *Id.* at 29.  Under this provision, Acuity must reimburse the owner of the restaurant for business income lost "due to the necessary suspension" of its operations *if* the "suspension" was "caused by direct physical loss of or damage to property" at the restaurant.  *Id.*  The policy defines a "suspension" as either "[t]he partial slowdown or complete cessation of . . . business activities" or when "a part or all of the described premises is rendered untenantable."  *Id.* at 30.  Thus:  If the restaurant (1) lost business income (2) due to a business suspension, it may recover the lost income (3) caused by (4) "direct physical loss of or damage to property."

Everyone agrees that the shut-down orders required Santosuossos to suspend its in-premises dining operations, that the restaurant lost business income due to that suspension, and that the orders caused the shutdown.  What separates the parties is disagreement over whether the suspension arose from a covered cause.  Does a pandemic-triggered government order, barring in-person dining at a restaurant, count as "direct physical loss of or damage to" the property?

The policy does not define these words, requiring us to give them their "common and ordinary" meaning.  *Olmstead v. Lumbermens Mut. Ins. Co.*, 259 N.E.2d 123, 126 (Ohio 1970).  That is cold comfort in one sense.  There is nothing common or ordinary about insurance contracts.

Ordinary people do not speak in the way the authors of insurance policies write. Consider the reaction you would receive if at the next social gathering you expressed your fears in the manner of this insurance contract: (1) "I'm afraid of 'loss or damage by theft' of my 'jewelry, watches, watch movements, jewels, pearls, precious and semi-precious stones, bullion, gold, silver, platinum and other precious alloys or metals,'" R.7-7 at 26; (2) "My home 'shows evidence of cracking, bulging, sagging, bending, leaning, settling, shrinkage or expansion,'" *id.* at 29; (3) "Where are the 'papers and records?'" "In whose 'care, custody or control' are they?" *id.* at 36; or (4) "I'm afraid of '[w]ar, including undeclared or civil war, . . . [w]arlike action by a military force, including action in hindering or defending against an actual or expected attack, by any government, sovereign or other authority using military personnel or other agents,' and '[i]nsurrection, rebellion, revolution, usurped power, or action taken by governmental authority in hindering or defending against any of these,'" *id.* at 39.

There is indeed nothing common about the language of insurance contracts. Then again, there is nothing common about the task at hand—capturing risk and what to pay for it, pricing unknowable future perils in a fair and predictable way. This is a specialized field of language, and aptly so. Hence the 26 pages and many words, sometimes overlapping words, needed to complete this contract. While there may be nothing common about the words found in insurance contracts, they often generate an ordinary meaning when anchored in the special context in which they are written.

That is true of the phrase around which this dispute revolves—"direct physical loss of or damage to" covered property—and the context in which it appears. Nothing unexpected arises from consulting dictionary definitions of the key disputed terms of this clause: "direct physical loss of" property. "Direct" means "[e]ffected or existing without intermediation or intervening agency; immediate." *Oxford English Dictionary Online* (3d ed. 2021). "Physical" means "natural; tangible, concrete." *Id.* "Loss" means "[p]erdition, ruin, destruction; the condition or fact of being 'lost,' destroyed, or ruined," or "being deprived of." *Id.* And "property" means "any residential or other building (with or without associated land) or separately owned part of such building (as an apartment, etc.)," as well as "[s]omething belonging to a thing; an appurtenance; an adjunct." *Id.*

Whether one sticks with the terms themselves (a "direct physical loss of" property) or a thesaurus-rich paraphrase of them (an "immediate" "tangible" "deprivation" of property), the conclusion is the same.  The policy does not cover this loss.  The restaurant has not been tangibly destroyed, whether in part or in full.  And the owner has not been tangibly or concretely deprived of any of it.  It still owns the restaurant and everything inside the space.  And it can still put every square foot of the premises to use, even if not for in-person dining use.

Think of the different potential sources of the restaurant's lost income—the virus and the State's shut-down orders—and whether either one created a "direct physical loss of or damage to" property.  The novel coronavirus did not physically affect the property in the way, say, fire or water damage would.  No one argues that the virus physically and directly altered the property.  The restaurant indeed makes no such argument.  The Governor's shut-down orders also did not create a direct physical loss of property or direct physical damage to it.  They simply prohibited one use of the property—in-person dining—while permitting takeout dining and through it all did not remotely cause direct physical damage to the property.  It was as if the government temporarily rezoned all restaurants in the State solely for takeout dining.  Even as restaurant owners no doubt would suffer from such a decision and no doubt would have reason to object to it, the government regulation would not create a direct physical loss of property.  A loss of use simply is not the same as a physical loss.  It is one thing for the government to ban the use of a bike or a scooter on city sidewalks; it is quite another for someone to steal it.  *See generally Image Dental LLC v. Citizens Ins. Co. of Am.*, No. 20-cv-02759, 2021 WL 2399988, at *7 (N.D. Ill. June 11, 2021) (noting that if a driver "drop[ped] his keys in Lake Michigan," that would be "a loss of the keys, but only a loss of use of the car"); *MIKMAR, Inc. v. Westfield Ins. Co.*, No. 1:20-CV-01313, 2021 WL 615304, at *5, *8 (N.D. Ohio Feb. 17, 2021).

The imperative of a "direct physical loss" or "direct physical damage," moreover, does not suddenly appear in the policy's section for additional coverage, such as business interruption losses.  It is the North Star of this property insurance policy from start to finish.  Recall how the policy starts:  "We will pay for direct physical loss of or damage to Covered Property . . . caused by or resulting from any Covered Cause of Loss."  R.7-7 at 25.  It then generally describes "Covered Causes of Loss" as "Risks of Direct Physical Loss."  *Id.* at 26.  Direct physical loss or

direct physical damage are the general touchstones of coverage for this policy—and indeed of coverage for most commercial property insurance policies. 10A Steven Plitt et al., *Couch on Insurance* § 148:46 (2021) ("In modern policies, especially of the all-risk type, th[e coverage] trigger is frequently 'physical loss or damage' . . . ."); 4 Andrew B. Downs & Linda M. Bolduan, *Law and Practice of Insurance Coverage Litigation* § 52:4 (2021) (describing how first-party property insurance policies typically cover "all direct physical losses not excluded").

It pays little heed to these omnipresent words in the policy, if not erases them, to construe them to cover business losses generated by a statewide shut-down order. All in all, the cause of the suspension of operations—the prohibition on in-person dining—did not arise from a physical loss of property or physical damage to it. *See Oral Surgeons, P.C. v. Cincinnati Ins. Co.*, 2 F.4th 1141, 1143–44 (8th Cir. 2021) (rejecting oral surgeon's claim that Iowa's gubernatorial order prohibiting non-emergency dental procedures was a "direct 'loss' to property"); *Gilreath Fam. & Cosm. Dentistry, Inc. v. Cincinnati Ins. Co.*, No. 21-11046, 2021 WL 3870697, at *1 (11th Cir. Aug. 31, 2021) (per curiam) (rejecting dentistry practice's claim that Georgia's shelter-in-place order caused "'direct physical loss or damage' to property").

Other terms in the policy reinforce this conclusion. Acuity promised to pay for lost business income only during the "period of restoration." R.7-7 at 29. That period begins 24 hours after the "time of direct physical loss or damage" and ends either when the insured property "should be repaired, rebuilt or replaced with reasonable speed" or when "business is resumed at a new permanent location," whichever comes first. *Id.* at 50. Baked into this timing provision is the understanding that any covered "direct physical loss of or damage to" property could be remedied by repairing, rebuilding, or replacing the property or relocating the business. But what would that mean under Santo's Café's interpretation of the policy? It has not alleged any problem with the building. There is nothing to repair, rebuild, or replace that would allow the resumption of in-person dining operations. What the restaurant needed was an end to the ban on in-person dining, not the repair, rebuilding, or replacement of any of its property.

The traditional uses of commercial property insurance also support this interpretation. Even when called "all-risk" policies, as these policies sometimes are, they still cover only risks that lead to tangible "physical" loss or damages, say by fire, water, wind, freezing and overheating,

or vandalism. *See Couch on Insurance* § 148:3; 4 Philip L. Bruner & Patrick J. O'Connor, *Bruner & O'Connor on Construction Law* § 11:39 (2021) (describing the "traditional property insurance product" as a method of insuring against "fire, windstorm, and the like"); 2 Myron Kove et al., *Real Estate Transactions* § 18:95 (2021) (explaining that property insurance covers "damage or destruction by the action of the elements" and has its origins in coverage for damage by fire or lightning). In each case, the subject property suffers a direct physical change, whether by damage to it that requires repair or the total loss of it that requires replacement. These policies do not typically apply to losses caused by government regulation. *See Couch on Insurance* § 148:3 (explaining that the "major risk categories" covered by property insurance are "deliberate theft"; "misplacement, misdelivery, or unexplained loss"; "contamination, pollution, and the like"; and "breakage/physical damage/destruction" (capitalization altered)); *id.* § 167:15 ("Because business interruption policies generally require some physical damage to the insured's business in order to invoke coverage, losses due to curfew and other such restrictions are not generally recoverable."). And they do not cover losses indirectly caused by a virus that injures people, not property. *See id.* § 148:3 (explaining that, when it comes to property insurance, "illness" is a "major risk categor[y]" that "only livestock face").

An Ohio decision also supports this reading. At issue in *Mastellone v. Lightning Rod Mutual Insurance Co.* was a claim by two homeowners seeking insurance coverage for mold growth. 884 N.E.2d 1130, 1133 (Ohio Ct. App. 2008). The policy covered a "direct loss to property 'only if that loss is a physical loss to property,'" which the court analogized to "physical injury." *Id.* at 1143. In defining the terms, the court relied in part on a treatise that explained what it generally means for a "loss" to be "physical," relying on the "ordinary definition" of the words. *Id.* (quotation omitted). That authority provided that a "physical loss" typically excludes the situation where one "merely suffers a detrimental economic impact unaccompanied by a distinct, demonstrable, physical alteration of the property." *Id.* (quotation omitted). Relying on that guidance, the court concluded that the policy did not cover mold growth. The evidence indicated that the stains "could be cleaned from the siding by using a solution of bleach and trisodium phosphate," and that, while the staining might redevelop, the siding had not "been structurally altered such that it would need to be replaced." *Id.* at 1144. Because the mold did not "adversely

affect[] the structural integrity of the house," it did not qualify as a "physical loss to property." *Id.* at 1143.

*Mastellone* is the harder case. It at least involved *some* physical change to the property, the mold covering the property. Not so in today's case. How could one say that the pandemic or Ohio's shut-down order physically altered the property or for that matter affected the "structural integrity" of the restaurant? All Santo's Café can say is that the restaurant cannot be put to one of its intended uses. *Mastellone* offers a good reason to think that the Supreme Court of Ohio, if faced with the question, would conclude that Santo's Café has not alleged a "physical loss of or damage to" its property. So do other Ohio decisions that have relied on *Mastellone*. *See, e.g.*, *Cincinnati Ins. Cos. v. Motorists Mut. Ins. Co.*, 18 N.E.3d 875, 882 n.5 (Ohio Ct. App. 2014); *Ohio Cas. Ins. Co. v. Hanna*, Nos. 07CA0016-M, 07CA0017-M, 2008 WL 2581675, at *3 (Ohio Ct. App. 2008); *cf. Universal Image Prods., Inc. v. Fed. Ins. Co.*, 475 F. App'x 569, 573 (6th Cir. 2012).

Santo's Café offers several responses to this conclusion. It first argues that, if "physical loss of or damage to" property does not cover the deprivation of a specific *use* of property, that transforms the phrase "physical loss" into surplusage. We have no quarrel with the canon against surplusage in the abstract, so long as it does not distract the interpreter's eyes from "the text of the contract" and the context in which it appears—here an insurance contract that rejoices in overlapping terms and concepts. *Beverage Holdings, L.L.C. v. 5701 Lombardo, L.L.C.*, 150 N.E.3d 28, 33 (Ohio 2019). But even on its own terms, the anti-surplusage canon does not take the restaurant where it wants to go. There is no need to read "physical loss" to include a deprivation of some particular use of a property in order to give the phrase independent meaning. That possibility could occur whenever a policy holder is deprived of property without any damage to it, say a portable grill or a delivery truck stolen without a scratch.

Santo's Café adds that "loss" is a synonym for "deprivation" and that it was deprived of its ability to use the premises for its intended purpose. It then points out that the closure orders have "forced [it] to halt ordinary operations"; that the "premises is unsafe, dangerous and unfit for its intended use"; and that Santo's Café "cannot access" the restaurant "for th[e] purpose" of "dine-in operations." R.1-1 at 3, 6. But this argument skates over the unrelenting imperative that the policy

covers only "physical" losses.  Ohio's prohibition on indoor dining no doubt caused an economic loss for Santo's Café.  But it did not cause a direct, physical loss of property, which is a precondition for the business suspension coverage in the policy and in fact for most coverage in the policy.

If we accepted the restaurant's invitation and construed any loss of *use* to be a physical loss of property, that would create problems of its own.  What if the pandemic or a worker shortage made it difficult for the restaurant to hire cooks and waiters?  Would that not prevent the restaurant from using the kitchen or offering in-person dining services?  Or what if the State had taken no action in response to the pandemic, but most people had stayed home anyway for fear of catching COVID-19?  Would that not prevent the restaurant from using the restaurant space as well?  There are many questions surrounding the restaurant's interpretation of this policy.  And the answers to each of them suggest the policy has no such application here.

Some courts, it is true, have held that a loss of the ability to use property sometimes may constitute a "physical loss."  But each case involved property that became practically useless for anything.  *See, e.g.*, *Port Auth. of N.Y. & N.J. v. Affiliated FM Ins. Co.*, 311 F.3d 226, 230 (3d Cir. 2002); *Motorists Mut. Ins. Co. v. Hardinger*, 131 F. App'x 823, 825–26 (3d Cir. 2005); *Seifert v. IMT Ins. Co.*, No. 20-1102, 2021 WL 2228158, at *5 (D. Minn. June 2, 2021); *One Place Condo, LLC v. Travelers Prop. Cas. Co. of Am.*, No. 11 C 2520, 2015 WL 2226202, at *9 & n.5 (N.D. Ill. Apr. 22, 2015); *Prudential Prop. & Cas. Ins. Co. v. Lillard-Roberts*, No. CV-01-1362-ST, 2002 WL 31495830, at *8–9 (D. Or. June 18, 2002); *Murray v. State Farm Fire & Cas. Co.*, 509 S.E.2d 1, 16–17 (W. Va. 1998); *W. Fire Ins. Co. v. First Presbyterian Church*, 437 P.2d 52, 55 (Colo. 1968).

Correctly decided or not, these cases stand a significant step removed from today's dispute.  Santo's Café has not alleged that its property is unusable or uninhabitable, only that it is "unsafe, dangerous and unfit for its intended use."  R.1-1 at 6.  One paragraph of the complaint, it is true, alleges that the orders closing the restaurant "prohibit [Santo's Café] and the public from having access to" the building.  *Id.* at 4.  But the theory is implausible, as it is inconsistent with the remainder of the complaint and above all with the text of the shut-down order itself.  *See Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).

The restaurant's efforts to marginalize *Mastellone* do not create a net gain. True, the decision did not interpret identical language. True also, the decision involved homeowners' insurance, not commercial insurance. But the court still construed similar language, a limit that the policy would "insure against direct loss to property 'only if that loss is a physical loss to property.'" *Mastellone*, 884 N.E.2d at 1143. And it still insisted on a direct physical form of damage when it came to the claim for coverage, honoring a similar limitation on coverage. Materially speaking, that is this case. No less significantly, Santo's Café offers nothing better—no affirmative authority under Ohio law to support its contrary position.

If all else fails, the restaurant contends, the provision at a minimum is ambiguous and thus should be construed in favor of the policyholder. But the policy is not ambiguous. "[D]irect physical loss of" property does not mean what Santo's Café says it means. It refers to direct physical loss of property, not the inability to use property. The restaurant's reliance on *Retail Ventures, Inc. v. National Union Fire Insurance Co. of Pittsburgh*, 691 F.3d 821 (6th Cir. 2012), does not help matters. The restaurant claims that the case establishes that a contract is necessarily ambiguous if it separately addresses "physical loss of" property and "damage to" property. But that overreads *Retail Ventures*. That case held only that the phrase "loss of proprietary information . . . or other confidential information" was ambiguous. *Id.* at 832–33. Today's terms did not make an appearance there.

Also mistaken is the restaurant's suggestion that any potential surplusage in an insurance contract—say some overlap between "direct physical loss" and "direct physical damage"—creates ambiguity sufficient to construe the contract against the insurer. As we have said before, "surplusage alone does not make an insurance policy ambiguous." *TMW Enters., Inc. v. Fed. Ins. Co.*, 619 F.3d 574, 578 (6th Cir. 2010) (quotation omitted) (applying Michigan law). The anti-surplusage canon, it is well to remember, "is one among many tools for dealing with ambiguity, not a tool for *creating* ambiguity in the first place." *Id.* The canon needs to be deployed with special care in a setting—insurance contracts—in which "redundancies abound" and particularly in a 26-page contract in which "iteration is afoot throughout." *Id.* at 577. It is no overstatement to say that it would not be an insurance contract if it did not come with some surplusage.

Nor is it just insurance contracts that flood us with words from time to time, saying two or more things where one will do. Lawyerly doublets and triplets sometimes amount to nothing more than manners of speaking and emphasis, not sources of ambiguity. *See* Bryan A. Garner, *The Redbook: A Manual on Legal Style* § 12.2(f) (4th ed. 2018). Judges are not above it all either. We are known for applying "arbitrary and capricious" review to agency actions. And the United States Supreme Court features its goal—"Equal Justice Under Law"—above the main entrance to its building. But what agency action has ever been capricious but not arbitrary? And does not a legal system devoted to "Justice Under Law" necessarily require providing it equally to everyone? While the anti-surplusage canon remains an essential tool for interpreting language, it remains acutely sensitive to the setting in which it is deployed. The canon has no meaningful role to play in this case.

In the last analysis, this commercial property insurance policy does not cover this business loss.

In view of this conclusion, we need not rely on—or finally construe—two coverage *exclusions* in the policy, each offering potential additional explanations for denying this claim. One is a virus exclusion. It says that Acuity "will not pay for loss or damage caused directly or indirectly by . . . [a]ny virus . . . capable of inducing physical distress, illness or disease." R.7-7 at 38–39. Broad as this language is, especially the "directly or indirectly" phrase, and clear as it is that a coronavirus is a "virus," it remains a legitimate question for a future court to determine how far the "indirectly" language extends. For now, the absence of initial coverage for this claim suffices to reject it.

The second exclusion warrants more discussion, though we need not rely on it either in the end. Labeled "Ordinance or Law," it says that "[w]e will not pay for loss or damage caused directly or indirectly by . . . [r]egulating the construction, *use* or repair of any property." *Id.* at 38 (emphasis added). At one level, this caveat seems to cover today's claim. The restaurant's losses arose from executive-branch orders "regulating" the "use" of the "property." Santo's Café counters that the State's shut-down order does not count as an "ordinance" or "law." That is doubtful. Under American separation of powers, governors and other state executive officials rarely have inherent authority. They may enforce or implement laws enacted by the legislature.

That is indeed what the Director of the Ohio Department of Health purported to do in Ohio when she promulgated this order under the emergency powers the Ohio General Assembly delegated to her under the statute setting forth the authority of the Department of Health. Ohio Rev. Code Ann. § 3701.13. That sounds like a law to us. And that conclusion makes all the more sense given the policy's later references to "enforcement" and to government actions "[r]egulating" the property. In truth, the ordinance or law dichotomy seems more likely to capture the difference between local government regulations on one side of the ledger and statewide and nationwide regulations on the other.

But we need not resolve the point because another uncertainty appears. Note that the word "use" in this coverage carve-out appears in a potentially limiting setting. The neighboring provisions of "use"—"construction" or "repair"—might suggest that this section does not deploy "use" in a broad sense. Context is everything in interpretation, central to all that we have said so far. It may be that "use" has a restricted meaning in this section, anchored to the restoration phase of dealing with an owner's property damage or loss. That leaves us inclined to save for another day the resolution of the meaning of the "ordinance or law" exclusion and its application to "use."

Even so, this back and forth generates one last insight. The essence of the restaurant's claim is that "physical loss" of property covers all inabilities to "use" that property. Having come to appreciate that "use" might have more than one meaning in the context of a provision in which the word actually appears, we are doubly wary of inserting its broadest meaning in a part of the policy in which it does not appear.

\* \* \*

The singular challenges facing restaurants, bars, and other hospitality services over the last eighteen months are not lost on us. Staying in business through a once-in-a-century pandemic (let us hope) that has prompted all kinds of new government regulations, including prohibitions on many in-person services, has to be trying. Sure, state and federal loans and grants have offered some support for entities that suffered government-created losses of this sort, and surely that aid has allowed some companies to survive. But that truth provides little solace to those that did not.

That leaves a hard reality about insurance. It is not a general safety net for all dangers. If risk is not having money when you need it, insurance is one answer to perilous events that could prompt a sudden drop in revenue. Fair pricing of insurance turns on correctly accounting for the likelihood of the occurrence of each defined peril and the cost of covering it. Efforts to push coverage beyond its terms creates a mismatch, an insurance product that covers something no one paid for and, worse, runs the risk of leaving insufficient funds to pay for perils that insureds did pay for. That is why courts must honor the coverage the parties did—and did not—provide for in their written contracts of insurance.

We affirm.