NOT RECOMMENDED FOR PUBLICATION
File Name: 22a0530n.06

No. 21-3229

## UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

**FILED**
Dec 21, 2022
DEBORAH S. HUNT, Clerk

EQUITY PLANNING CORPORATION, )
)
    Plaintiff-Appellant, )
)
v. )
)
WESTFIELD INSURANCE COMPANY, )
)
    Defendant-Appellee. )
)

ON APPEAL FROM THE UNITED
STATES DISTRICT COURT FOR
THE NORTHERN DISTRICT OF
OHIO

OPINION

Before: MOORE, GRIFFIN, and MURPHY, Circuit Judges.

MURPHY, Circuit Judge. Equity Planning Corporation leases commercial property to tenants in Ohio and other states. Like many businesses, these tenants lost substantial income due to the COVID-19 pandemic and the ensuing government orders that temporarily banned non-essential business activities. They were thus unable to pay rent to Equity. Equity sought to recover its own lost income under a commercial insurance policy that it had purchased from Westfield Insurance Company. The policy obligates Westfield to pay for some amounts of lost income when this economic loss grows out of a "direct physical loss of or damage to" Equity's property. Policy, R.5-3, PageID 118. The district court granted Westfield's motion to dismiss because neither the pandemic nor the government shutdown caused a "direct physical loss of or damage to" Equity's leased properties. In the meantime, another district court asked the Ohio Supreme Court to consider a similar insurance-policy question. *See Neuro-Commc'n Servs., Inc. v. Cincinnati Ins.*

*Co.*, __ N.E.3d __, 2022 WL 17573883, at *3 (Ohio Dec. 12, 2022). We held this case for the Ohio Supreme Court's answer. That court has now interpreted similar policy language to bar coverage in these circumstances—consistent with our own prior answer to this question. *See id.* at *4 (quoting *Santo's Italian Café LLC v. Acuity Ins. Co.*, 15 F.4th 398, 402 (6th Cir. 2021)). Bound by *Neuro-Communication*, we affirm.

I

Equity, a real-estate company, leases out commercial properties in Ohio and other states. Like many other businesses in Ohio, Equity's tenants were forced to close in part or in full due to the combined effects of the COVID-19 pandemic and the follow-on government orders that prohibited non-essential business activities. With its tenants unable to pay their rent, Equity suffered significant economic losses.

Before the pandemic, Equity had purchased an "all-risk" commercial insurance policy from Westfield. This policy indicates generally that Westfield will cover "direct physical loss of or damage to" Equity's properties. Policy, R.5-3, PageID 176. Two other types of coverage are relevant. The policy's "Business Income Provision" allows Equity to seek certain lost income or extra expenses from Westfield. Specifically, this provision permits Equity to recover for the "actual loss of Business Income" resulting from a "suspension" of its operations if the suspension is "caused by direct physical loss of or damage to" Equity's properties. *Id.*, PageID 118. The provision also permits Equity to recover other "necessary expenses" that the company "would not have incurred if there had been no direct physical loss or damage to" its property. *Id.*

The policy's "Civil Authority Provision" next allows Equity to seek lost income and extra expenses incurred as a result of governmental responses to damage to *neighboring* property. The policy provides that Equity may seek its income and expenses if an "action of civil authority" (that

2

is, a government action) prohibits access to its properties because of "damage to" nearby property that was caused by a "Covered Cause of Loss." *Id.*, PageID 119. The policy defines "Covered Causes of Loss" to mean "direct physical loss unless the loss is excluded or limited in this policy." *Id.*, PageID 165.

The policy also contains many exclusions that prohibit coverage even if it would otherwise insure certain losses. Among other exclusions, the policy notes that Westfield will not pay for losses caused by a virus that can induce "physical distress, illness or disease." *Id.*, PageID 130.

Once the pandemic hit, Equity sought to recover its lost income under the Business Income Provision and the Civil Authority Provision. Westfield denied its claim, so Equity sued Westfield in state court. Equity sought a declaratory judgment that it was entitled to coverage and alleged that Westfield's denial of coverage breached both the policy and the covenant of good faith and fair dealing. Equity also sought to certify several classes of businesses. Westfield removed the case to federal court on the basis of the Class Action Fairness Act.

Westfield then moved to dismiss the complaint for failure to state a claim. The district court granted this motion. *Equity Plan. Corp. v. Westfield Ins. Co.*, 522 F. Supp. 3d 308, 310 (N.D. Ohio 2021). It reasoned that neither the pandemic nor the government shutdown orders qualified as a "direct physical loss of or damage to" Equity's property that could trigger coverage for lost income under the Business Income Provision. *Id.* at 316–28. This reading, the court next noted, also disqualified Equity from coverage under the Civil Authority Provision. *Id.* at 328–29. This provision required the damage to nearby property to arise from a "Covered Cause of Loss," a phrase the policy defined as a "direct physical loss" that is not otherwise excluded. *Id.* (quoting Policy, R.5-3, PageID 165). The court went on to hold, in the alternative, that Equity's claim fell within the exclusion for losses caused by a virus. *Id.* at 329–31.

Equity appealed. We review the district court's dismissal of its complaint de novo. *See Wilkerson v. Am. Fam. Ins. Co.*, 997 F.3d 666, 668 (6th Cir. 2021).

II

We start by framing the narrow nature of the parties' debate. They agree that Ohio contract law governs. They also agree on the governing contract rules: Ohio courts interpret unambiguous contract terms as written and they construe ambiguous terms in favor of the insured. *See Neuro-Commc'n*, 2022 WL 17573883, at *3; *Dominish v. Nationwide Ins. Co.*, 953 N.E.2d 820, 822 (Ohio 2011); *Nationwide Mut. Fire Ins. Co. v. Guman Bros. Farm*, 652 N.E.2d 684, 686 (Ohio 1995). The parties likewise agree that their dispute under the Business Income Provision turns on whether Equity suffered a "direct physical loss of or damage to" its property. Policy, R.5-3, PageID 118. And Equity does not challenge the district court's further conclusion that the Civil Authority Provision also requires a "direct physical loss" because it notes that the "damage to" nearby property must result from a "Covered Cause of Loss." *Id.*, PageID 119, 165. Given these points of agreement, this appeal turns on whether the spread of COVID-19 or the ensuing government shutdown orders could qualify as a "direct physical loss of or damage to" Equity's properties (or nearby properties). Westfield says that this text is unambiguous and requires a tangible harm to property. Equity responds that "direct physical loss" is ambiguous and could be read to cover limits on the use of property.

The Ohio Supreme Court decided to consider a similar question in *Neuro-Communication*. 2022 WL 17573883, at *3. In that case, the relevant insured business provided "hearing and balance services to its patients[.]" *Id.* at *2. The Ohio government's shutdown orders forced it to close its operations for about six weeks, and it sought reimbursement for lost income under a similar insurance policy issued by Cincinnati Insurance Company. *Id.* The Ohio Supreme Court

4

rejected the business's argument that the phrase "physical loss" could include a loss of use of its property to serve customers. *Id.* at \*4. It reasoned that a "physical loss" requires "loss or damage to Covered Property that is physical in nature" and thus does not cover simply "a loss of the ability to use Covered Property for business purposes." *Id.*

In the process, the Ohio Supreme Court agreed with our own prior decision in *Santo's*. *See* 2022 WL 17573883, at \*4. *Santo's* concerned an Ohio restaurant owner seeking to recover business losses caused by the pandemic and the Ohio government's responses restricting in-person dining. *See* 15 F.4th at 400. Like Westfield's insurance policy in this case, the policy in *Santo's* covered the loss of business income resulting from a suspension of operations "caused by direct physical loss of or damage to property" at the covered premises. *Id.* (citation omitted). *Santo's* held that this phrase ("direct physical loss of or damage to" property) unambiguously excluded losses arising from COVID-19 or related government shutdown orders. *Id.* at 401–02. We interpreted this language as covering only "tangible" deprivations of or "tangible" harms to property, like those caused by a theft or fire. *See id.* at 403 (citing 10A Steven Plitt et al., *Couch on Insurance* § 148:3 (2021)). The Ohio Supreme Court's approval of *Santo's* confirms that we properly applied Ohio contract law. *See Neuro-Commc'n*, 2022 WL 17573883, at \*4.

This case raises the same question as *Neuro-Communication* (and *Santo's*), so we must reach the same answer. In cases governed by Ohio contract law, we "must follow the controlling decisions of the Ohio Supreme Court." *Henry v. Wausau Bus. Ins. Co.*, 351 F.3d 710, 713 (6th Cir. 2003). And we see no basis to distinguish the contract in this case from the one in *Neuro-Communication*. *Cf. SAS Int'l, Ltd. v. Gen. Star Indem. Co.*, 36 F.4th 23, 26–29 (1st Cir. 2022).

To be sure, a phrase in one contract does not necessarily take the same meaning as the same phrase in another contract if the context suggests that the parties intended a different meaning.

*See Wilkerson*, 997 F.3d at 669–70.  But the context suggests that the parties meant for the same meaning across these cases.  To begin with, specialized trade usages can support an inference of consistent meaning.  *Cf. Frigaliment Importing Co. v. B.N.S. Int'l Sales Corp.*, 190 F. Supp. 116, 119 (S.D.N.Y. 1960) (Friendly, J.).  And, as *Santo's* recognized, the phrases at issue in these cases "are the general touchstones of coverage . . . for most commercial property insurance policies." 15 F.4th at 402 (citing 10A *Couch on Insurance* § 148:46).  That is perhaps why—as the Ohio Supreme Court noted—the great weight of appellate authority to consider this question has interpreted similar insurance policies in the same way (under other states' laws).  *See Neuro-Commc'n*, 2022 WL 17573883, at *7; *see, e.g.*, *Ryan P. Estes, D.M.D., M.S., P.S.C. v. Cincinnati Ins. Co.*, 23 F.4th 695, 699–702 (6th Cir. 2022) (Kentucky law); *Mudpie, Inc. v. Travelers Cas. Ins. Co. of Am.*, 15 F.4th 885, 890–91 (9th Cir. 2021) (California law); *SAS Int'l*, 36 F.4th at 26–29 (1st Cir. 2022) (Massachusetts law); *Q Clothier New Orleans, L.L.C. v. Twin City Fire Ins. Co.*, 29 F.4th 252, 258–60 (5th Cir. 2022) (Louisiana law); *Oral Surgeons, P.C. v. Cincinnati Ins. Co.*, 2 F.4th 1141, 1143–44 (8th Cir. 2021) (Iowa law); *see also Cherokee Nation v. Lexington Ins. Co.*, __ P.3d __, 2022 WL 4138429, *4 n.13 (Okla. Sept. 13, 2022) (citing cases).

In addition, other provisions in Westfield's policy confirm that the policy uses "direct physical loss" in the same way to require tangible harm.  Like the policy in *Neuro-Communication*, the Business Income Provision permits an insured to recover income for business suspensions only during the "period of restoration"—a defined period that ends when the property should have been "repaired, rebuilt or replaced with reasonable speed and similar quality[.]"  Policy, R.5-3, PageID 118, 126.  This provision would make no sense if "direct physical loss" need not be tangible.  *See Neuro-Commc'n*, 2022 WL 17573883, at *4; *see also Santo's*, 15 F.4th at 402–03.  Likewise, the Civil Authority Provision applies only if the government restricts access to Equity's properties

6

either because of the "dangerous physical conditions" of the nearby damaged property or because the government needs "unimpeded access to the damaged property." Policy, R.5-3, PageID 119. This provision, too, contemplates tangible property damage.

In sum, we are bound by *Neuro-Communication*'s interpretation. Under that analysis, Equity has not adequately alleged the required "direct physical loss of or damage to" its property or to nearby properties simply from its loss of use. *Neuro-Commc'n*, 2022 WL 17573883, at \*4. As we noted in *Santo's*, therefore, we need not consider any other interpretive question, such as whether the virus exclusion would otherwise have barred Equity's claim. *See* 15 F.4th at 406–07.

We affirm.